GUSSIE LEE STUBBS, FLORENCE STEVENSON AND FAN-
NIE M. DOSS, ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED, PLAINTIFFS, v. SE-
CURITY CONSUMER DISCOUNT COMPANY, A PENN-
SYLVANIA CORPORATION, KENBEE MORTGAGE COM-
PANY, A NEW JERSEY CORPORATION, LEONARD
MOONBLATT, ROBERT HUBER, ROBERT L. MALA-
TESTA, ADMINISTRATOR OF THE ESTATE OF LOUIS
J. MALATESTA, DECEASED, AND FIDELITY BANK, A
PENNSYLVANIA CORPORATION, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided April 24, 1978.

See also, 146 *N. J. Super.* 160.

*Mr. Kenneth E. Meiser* for plaintiffs (*Mr. Stanley C. Van Ness,* Public Advocate, attorney).

*Mr. George F. Kugler, Jr.* for defendants Kenbee Mortgage Company and Fidelity Bank (*Archer, Greiner & Read,* attorneys; *Mr. Robert G. Harbeson* on the brief).

*Mr. Charles Crabbe Thomas* for defendant Leonard Moonblatt.

ROSSETTI, J. C. C. (temporarily assigned). This is a class action which arises out of numerous secondary mortgages obtained from New Jersey homeowners by Security Consumer Discount Company (Security), a now defunct secondary mortgage company. The plaintiff class is seeking to set aside these mortgages, alleging that they were executed in violation of the New Jersey Secondary Mortgage Loan Act, *N. J. S. A.* 17 :11A–34 *et seq.*

Security was a corporation licensed under the Secondary Mortgage Loan Act. Its mortgages are being serviced by defendant Kenbee Mortgage Company, a corporation wholly controlled by defendant Fidelity Bank. Fidelity was the primary source of monies for the loans Security made (see 146 *N. J. Super.* 160 (Law Div. 1976)).

Security commenced operations in New Jersey in 1968 by renting office facilities from defendant Robert Huber. For an additional consideration Huber provided personnel to staff the office and receive loan applications, make credit checks and forward other information to the Philadelphia office of Security. In 1971 Security established a second New Jersey office on premises let by defendant Louis Malatesta, a home repair contractor.

Security engaged Anthony Cavuto, an attorney licensed to practice in the State of New Jersey, to prepare the documents in connection with secondary mortgage Loan closings, for which he was paid $235. for such transaction. Cavuto, in turn, employed Huber, who was formerly licensed under the Secondary Mortgage Loan Act, and delegated to him the bulk of the responsibility for preparing the necessary documents, scheduling and conducting the closings, and ensuring that the requirements of the act were met. In consideration of his services Cavuto paid Huber a large part of the fee which he received from Security. Cavuto reviewed all documents to ensure conformity to the act.

At some time during the course of Huber's employment he persuaded Malatesta to pay him 15% of each' loan from Security to Malatesta's customers. Malatesta paid these "kickbacks" to ensure the approval of every application made by one of his customers. The primary thrust of the Huber-Malatesta conspiracy was the creation and recordation of fictitious first mortgages in anticipation of obtaining secondary mortgages.

This court finds from the evidence that Security, its officers and directors had no knowledge of these practices by

Huber and Malatesta. The files of Security indicate that all necessary documents were executed in compliance with the Truth in Lending Act, 15 *U. S. C. A.* § 1601 *et seq.;* Regulation Z, 12 *C. F. R.* § 226.1 *et seq.,* and the Secondary Mortgage Loan Act, *N. J. S. A.* 17:11A–34 *et seq.* There is no evidence that Security attempted to withhold information from borrowers or deceive them.

The members of the class were afforded ample opportunity to review all documents, make inquiries, obtain legal representation and cancel the transaction by acting within the prescribed 72-hour "cooling-off" period. 15 *U. S. C. A.* § 1635.

I

*N. J. S. A.* 17:11A–58 provides:

Any obligation on the part of a borrower arising out of a secondary mortgage loan shall be void and unenforceable unless such secondary mortgage loan was executed in full compliance with the provisions of this act.

Plaintiffs allege violations of *N. J. S. A.* 17:11A–46, which commences as follows: "A secondary mortgage loan *licensee* shall not * * * (emphasis supplied.)

The enforceability of the mortgages depends on whether *N. J. S. A.* 17:11A–58 applies to statutory violations committed by representatives of the licensee, in this case Huber and Malatesta, who are not officers, directors, stockholders or employees. There are no reported decisions in which a court has interpreted these sections of the act.

The Secondary Mortgage Loan Act represents the legislative response to widespread complaints concerning false and misleading advertising respecting the availability of loans and the terms thereof and the exaction of exorbitant rates of interest and other concomitant charges from needy borrowers. *Oxford Consumer Discount Co. v. Stefanelli,* 102 *N. J. Super.* 549, 576 (App. Div. 1968) ; supplemented 104

*N. J. Super.* 512 (App. Div. 1969) ;. aff'd with modifications, 55 *N. J.* 489 (1970). The act is penal as to the lender and remedial as to the borrower. *HIMC Investment Co. v. Siciliano,* 103 *N. J. Super.* 27, 39 (Law Div. 1968).

A total reading of the Secondary Mortgage Loan Act would indicate that the Legislature intended to regulate and control both the acts of licensees and the conduct of all other persons who are involved in secondary mortgage loan transactions. It was also intended that violations by a licensee would be penalized differently than violations by a nonlicensee.

A licensee and nonlicensee are both subject, upon proof of statutory violations, to civil penalties pursuant to *N. J. S. A.* 17:11A–59(b). The scope of this penalty provision is indeed broad, as it applies to "any person, including any licensee or any officer, director or employee * * * of such licensee, or any other person representing a licensee, whether directly or indirectly," who violates any provision of the act.

The framers of this legislation were well aware of the distinction between a licensee and the broad category of persons recited in *N. J. S. A.* 17:11A–59(b). Clearly, if the intent was for the extreme sanction of *N. J. S. A.* 17:11A–58 to apply to the same class as *N. J. S. A.* 17:11A–59(b), the act would have so stated. This court must conclude, therefore, that application of the enforceability provision was meant to be restricted to licensees who have violated the act or have condoned or ratified the illegal actions of their employees or representatives.

The legislative intent was to empower the Commissioner, in the first instance, to monitor enforcement of the act. *N. J. S. A.* 17:11A–54, 59. This court believes that the penal and deterrent functions of the act are effectuated when nonlicensees are fined and penalized pursuant to *N. J. S. A.* 17:11A–59(b). In this case the alleged violations were the subject of hearings before the Commissioner of Banking. Appropriate penalties have been imposed upon the various defendants by the Commissioner. Although the licensee was

among those who were fined, the violations which it admittedly committed do not relate to the execution of secondary mortgage loan obligations. Thus, no additional action with respect to the imposition of penalties is required of the court.

▊ In this case the court has determined that Huber and Malatesta were not officers, directors, shareholders or employees of Security. Although Huber is properly characterized as Security's representative, the court is convinced that Security, the licensee, had no knowledge of the payments by Malatesta to Huber or the fictitious first mortgages obtained by Malatesta.

Since the statutory violations committed by Huber and Malatesta are not attributable to the licensee, the court holds that the extreme sanction under *N. J. S. A.* 17:11A–58 can not be utilized to afford relief to these plaintiffs and that the secondary mortgage obligations are enforceable.

## II

▊ Plaintiff class seeks equity from the court. The remedial nature of the act compels the court to fashion equitable relief where the imposition of fines and the enforcement of secondary mortgage obligations have not balanced the scales of justice. This totality of the circumstances approach was utilized by the court in *HIMC Investment Co. v. Siciliano,* 103 *N. J. Super.* 27, 38–40 (Law Div. 1968).

▊ In this case, even though the actions of Huber and Malatesta are not attributable to the licensee, the licensee, through its carelessness in selecting these representatives and monitoring their activities, contributed to the circumstances which fostered the Malatesta-Huber conspiracy to prey upon the plaintiff class. Equity demands that some remedy be fashioned to redress the resultant harm.

This court is convinced that to the extent a 15% "kickback" was paid by Malatesta to Huber, Malatesta must have recouped that payment in the contracts for home improvements with the borrowers. To that extent, plaintiff

class became the victims from whom Malatesta and Huber obtained these illegal fruits. Accordingly, it is the order of the court that the class be afforded a credit of 15% of the original loan amount, to be applied to any existing unpaid balance.

Since members of the sub-class from whom Malatesta obtained fictitious first mortgages could have obtained first mortgage loans at a lower rate of interest, it is ordered that the interest rates on their loans be restated so as to permit only the authorized interest rate on first mortgage loans in the State of New Jersey at the time those mortgages were executed. This sub-class is to receive a credit as against any unpaid balance for the difference between the authorized first mortgage loan interest and the secondary mortgage loan interest actually charged.

Finally, it should be pointed out that the class, which seeks equity, is not entirely blameless. This court is satisfied that the class understood as much of the loan transaction as they chose to. There is no indication that they were deprived of the opportunity to read the documents or obtain explanation of their import. It is clear that the licensee complied with the provisions of the Truth in Lending Act, 15 *U. S. C. A.* § 1601 *et seq.*, Regulation Z, 12 *C. F. R.* § 226.1 *et seq.*, and the Secondary Mortgage Loan Act, *N. J. S. A.* 17:11A–34 *et seq.*, in an attempt to provide the borrowers with the information required by these acts. These borrowers, for the most part, chose not to read the documents and to sign whatever was placed before them. Their neglect is not chargeable to Security and must be considered in the determination of equitable remedies. It is most unfortunate that the lofty aims of both state and federal legislators in drafting the aforementioned statutes have been met with such indifference by the members of plaintiff class, the very group who these acts set out to protect.

Accordingly, judgment will be entered directing the enforceability of the mortgages to the extent set forth herein.