171 N.J. Super. 67 (1979)
407 A.2d 1269
GUSSIE LEE STUBBS, FLORENCE STEVENSON AND FANNIE M. DOSS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS,
v.
SECURITY CONSUMER DISCOUNT COMPANY, KENBEE MORTGAGE COMPANY, LEONARD MOONBLATT AND FIDELITY BANK, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 10, 1979.
Decided November 7, 1979.
*69 Before Judges MATTHEWS, ARD and POLOW.
Mr. Kenneth E. Meiser, Assistant Deputy Public Advocate, for appellants (Mr. Stanley C. Van Ness, Public Advocate, attorney; Mr. Carl S. Bisgaier and Ms. Linda R. Hurd, Assistant Deputy Public Advocates, on the brief).
Mr. George F. Kugler, Jr. for respondents and cross-appellants (Messrs. Archer, Greiner and Read, attorneys; Mr. Robert G. Harbeson and Robert T. Egan on the brief).
BY THE COURT.
Plaintiffs, purporting to act on behalf of 162 secondary mortgage borrowers as a class, appeal from the trial court decision *70 rejecting their demand that the subject mortgages be declared void and unenforceable under the Secondary Mortgage Loan Act, N.J.S.A. 17:11A-34 et seq. Defendants cross-appeal from the award of a 15% credit on the original principal of all mortgages not fully satisfied.
Defendant Security Consumer Discount Company (Security), a licensee under the act, is the mortgagee named in all of the second mortgage transactions. Security is now defunct and the mortgages have been assigned to defendant Fidelity Bank. Fidelity has set up a subsidiary, defendant Kenbee Mortgage Company, a New Jersey corporation licensed under the Secondary Mortgage Loan Act, to service the mortgages.
Two individuals, Huber and Malatesta, provided office space to Security for the operation of its secondary mortgage financing business. The trial judge found that both of them played a significant role in a conspiracy to execute and record fictitious first mortgages in 30 of the second mortgage transactions in order to create the appearance of compliance with the act. But the judge reasoned that Huber was merely a "representative" of Security rather than an officer, director or shareholder, and that Security, having no knowledge of such practices, neither condoned nor ratified such illegal acts. Hence the judge concluded that the improprieties were not the acts of the licensee itself and he rejected plaintiffs' demand for the extreme sanction of forfeiture under N.J.S.A. 17:11A-58.
We disagree and remand for entry of judgment declaring void and unenforceable all secondary mortgages which were executed together with fictitious first mortgages.
N.J.S.A. 17:11A-58 provides:
Any obligation on the part of a borrower arising out of a secondary mortgage loan shall be void and unenforceable unless such secondary mortgage loan was executed in full compliance with the provisions of this act. [Emphasis supplied]
*71 The record below leaves no doubt that the 30 "second" mortgages effectuated by the creation of fictitious first mortgages were executed in direct violation of the statute as part of a deliberate scheme to circumvent full compliance with its provisions. A summary of the roles of each of the principals illustrates the extent of the conspiracy.
In 1968 Security rented office space in Camden from Huber, who had been a secondary mortgage licensee but whose license was revoked when he failed to maintain the required $50,000 net worth. N.J.S.A. 17:11A-45(d). Huber received $50 a month for rent and $100 a month for services of his secretary rendered for the benefit of Security. Although Huber never was a paid employee, he managed Security's Camden office and used his staff to process loans, perform title searches, collect on Security's mortgages and prepare all documents in connection with Security's mortgage loans. Huber forwarded all credit applications to defendant Moonblatt in Philadelphia for approval or disapproval. If approved, Moonblatt returned them to Huber to arrange and complete the transaction. Moonblatt was the director, secretary and treasurer of Security and, together with his wife, owned all of the stock. No employees of Security were in any other way involved in the creation, preparation, execution or closing of the mortgage transactions in question.
Security was permitted to open a second office in Carmel, New Jersey, which was provided rent free by Malatesta, a home repair contractor. Again, arrangements for this office were made by Huber, who was responsible for all applications, documents, title searches and closings which originated in both of Security's New Jersey offices.
Malatesta agreed to pay Huber 15% of all monies received from Security loans for home repair contracts. In hearings before the Department of Banking, Malatesta conceded that 15% "kickbacks" were paid to Huber, but he denied that he increased the prices for home repairs to recoup the sums paid to Huber. *72 Malatesta died before the trial in this case. Hence, there was little evidence available before the court concerning the 15% payments except for the record of the departmental hearing where Malatesta insisted that the failure to increase his charge to the customers to cover Huber's 15% resulted in substantial losses to his business.
The loan applications were processed by Huber. When an application was approved by Moonblatt, Huber notified Malatesta, who arranged for his customers to sign the necessary documents. Of the 12 members of plaintiff class who testified, ten had closings which took place in Security's Carmel office. Two of them closed in their own homes, a violation of the requirements of N.J.S.A. 17:11A-46. Malatesta was present at all of those closings and Huber attended about half of them. No other representative of Security appeared.
Eleven of the 12 members of plaintiff's class who testified asserted that they did not know what they were signing. They allegedly understood that the documents were installment agreements to pay for home repair work by Malatesta. Seven of them had been solicited by Malatesta's salesmen. Malatesta acted through Huber, the representative of the mortgage lender, to arrange the mortgages. Malatesta also sold the services for which the money was lent. N.J.S.A. 17:11A-46(k) prohibits direct or indirect solicitation of business by the lender for the seller of services.
This action was instituted by the named plaintiffs "on behalf of themselves and all others similarly situated." Apparently the trial judge assumed this to be an appropriate class action and thus dealt with all of the outstanding mortgages collectively. The whole "class" of 162 mortgagees was denied forfeiture and all of the mortgages not yet fully satisfied were provided with an automatic 15% discount.
The record on appeal contains no order determining maintainability of the suit as a "class action" as required by R. 4:32-2(a). *73 Nor do we know what notice, if any, was provided to all members of the "class" pursuant to R. 4:32-2(b). We conclude that this action is properly maintainable only as a partial class action. The general class may be divided into subclasses with respect to particular common issues of law or fact. R. 4:32-2(d).
Treating the 30 cases which involved fictitious first mortgages as a subclass, there is a common question of law applicable to all of them. The trial judge refused to declare the 30 mortgages in this category unenforceable. He determined that N.J.S.A. 17:11A-58 is inapplicable since Huber and Malatesta were neither licensees nor officers, directors, stockholders or employees of the licensee. Instead, he characterized Huber merely as a "representative" of the licensee and thus found the statutory penalty of forfeiture inapplicable against the licensee.
We are fully satisfied that the statutory responsibility must be imposed upon the licensee in this situation. Huber was Security's agent for the conduct of these transactions. He was the representative of Security with whom all of the mortgagors had to deal. To permit the licensee to evade its statutory responsibility by this device would be to make a mockery of the public policy declarations which inspired enactment of the Secondary Mortgage Act. See Erie R.R. Co. v. S.J. Groves & Sons Co., 114 N.J.L. 216, 219 (E. & A. 1934); Ross v. Realty Abstract Co., 50 N.J. Super. 147, 154 (App.Div. 1958); Restatement, Agency 2d, § 43 at 133-134 (1958).
Legislative history indicates that the framers of the act sought to eliminate undesirable practices by lending institutions, such as misleading advertising and obtaining unconscionable interest payments and exorbitant fees secured by secondary mortgages on real estate. The Legislature intended to restrict the fees to be charged, to put safeguards around the transactions, to control the location of the place of business, to upgrade the manner of keeping books and records and to give the State "tight-fisted control over the secondary mortgage loan business." Crescent Invest. Co. v. Banking & Ins. Comm'r, 103 N.J. Super. 11, 18-19 (Ch.Div. 1968).
*74 The primary policy motivation behind the enactment was to protect individuals owning small residential structures, four families or less, who need secondary financing, and to assure them of fair dealing. The act is directed against the type of second mortgage lenders who, as a group, had abused borrowers in the past. It imposes restrictions upon the lenders, not the borrowers, "to effectuate the purposes of [the] act and to establish and maintain ethical, fair, equitable and honest business standards for [those subject to its provisions]." N.J.S.A. 17:11A-54(a); City Consumer Services v. Banking Dep't, 134 N.J. Super. 588, 591 (App.Div. 1975).
The trial judge found that "the class, which seeks equity, is not entirely blameless [since] the class understood as much of the loan transaction as they chose to." 161 N.J. Super. at 136. Citing the borrowers' failure to read the documents carefully, he denied them strict application of the statutory remedy.
The record clearly indicates that the architects of the conspiracy were Huber and Malatesta. Both assisted in the execution of the fraudulent affidavits and fictitious first mortgages and, in fact, Malatesta was the named first mortgage in most instances. Eleven of the borrowers who testified claimed to have been deliberately misled to the extent that they were unaware that they had executed second mortgages and were unaware of the contents of their affidavits. Whether they were so misled or not does not relieve defendants of the consequences of the deliberate violations of the provisions of the statute committed by Huber and Malatesta. See Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 338 (1961). This is the very type of practice which the statute was intended to prevent. Therefore, we find that all mortgages which were arranged together with fictitious first mortgages were "executed" without "full compliance" with the act and are void and unenforceable under N.J.S.A. 17:11A-58.
This determination of law will apply to all 30 members of the subclass, the trial judge having found that 30 of the subject *75 mortgages were executed together with fictitious first mortgages. That finding is not contested by defendants. However, the opinion below does not identify the individual mortgages which are included within that group. Upon remand the trial court must determine which secondary mortgages were executed with fictitious first mortgages. The names of the individual mortgagors should be listed in an appropriate judgment. If counsel are unable to agree on the identity of those individuals, the record may be supplemented to provide adequate proof with regard to all individual mortgages as are deemed to require supplementation. Sworn testimony or affidavit may be provided to prove the existence of a fictitious mortgage in connection with any member of the subclass who did not testify at the original trial.
The trial judge found that the 15% "kickback" was applied on all the loans and that "Malatesta must have recouped that payment in the contracts for home improvements with the borrowers." 161 N.J. Super. at 135. Hence, he ordered all unpaid balances reduced accordingly. We find no support for the conclusion that all customers were charged an additional 15% to cover the Malatesta-Huber payments. The order in question is accordingly reversed and the issue remanded.
On remand all of the mortgagors not included in the "fictitious first mortgage" category should be given the opportunity to prove that a 15% "kickback" was, in fact, added to the cost of improvements charged by Malatesta. Upon satisfactory proof based not upon mere conjecture but upon substantial evidence that the 15% was added to the cost of improvements, any such mortgage must be deemed unenforceable under N.J.S.A. 17:11A-58. The statute prohibits any charge or payment, directly or indirectly, of a commission or any other thing of value against the borrower. N.J.S.A. 17:11A-46(h).
The trial court should also fashion and direct plaintiffs to forward the best notice practical under the circumstances to each mortgagor not individually named as plaintiff herein, consistent *76 with requirements of due process and the provisions of R. 4:32-2(b). In preparing the notice reference should be made to any relevant allegations in the complaint so that each individual mortgagor may have the opportunity to prove excessive charges, illegal fees or any other fraudulent practices prohibited by the statute. N.J.S.A. 17:11A-46. The notice should also contain advice as to how, when and where such proof is to be presented.
Individual factual findings must be made with regard to each mortgage on which a claim is presented pursuant to such notice, and individual determinations are to be included in the final judgment or judgments as the case may be.
Reversed and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.