GUSSIE LEE STUBBS, FLORENCE STEVENSON AND FANNIE M. DOSS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS, v. SECURITY CONSUMER DISCOUNT COMPANY, KENBEE MORTGAGE COMPANY, LEONARD MOONBLATT AND FIDELITY BANK, DEFENDANTS-RESPONDENTS.

Argued November 5, 1980—Decided March 19, 1981.

*Kenneth E. Meiser,* Deputy Director, argued the cause for appellants (*Stanley C. Van Ness,* Public Advocate, attorney).

*Mark S. Rattner,* Deputy Attorney General, argued the cause for *amicus curiae* New Jersey Commissioner of Banking (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney General, of counsel).

*George F. Kugler, Jr.,* argued the cause for respondents (*Archer, Greiner and Read,* attorneys).

The opinion of the Court was delivered by

SULLIVAN, J.

This appeal involves a class action by 162 low income homeowners against Security Consumer Discount Company (Security) and its successors in interest.[1]  Plaintiffs seek to have certain

---

[1]Security, a licensee under the Secondary Mortgage Loan Act, *N.J.S.A.* 17:11A–34 *et seq.,* from 1968 to 1974, is the mortgagee named in all of the second mortgages. Its license to engage in the secondary mortgage loan

secondary mortgage loans issued by Security declared void and unenforceable [2] as executed in violation of the Secondary Mortgage Loan Act, *N.J.S.A.* 17:11A–34 *et seq.*

In 1968, Security, a Pennsylvania corporation, obtained a license to engage in the secondary mortgage loan business in New Jersey. Leonard Moonblatt, Security's director, secretary-treasurer and joint owner, met with Robert Huber who was then owner and operator of Robert Huber Associates, Inc. (a secondary mortgage licensee in New Jersey from 1966 to 1970) with regard to establishing an office in Camden, New Jersey. Huber subsequently agreed to rent Security a one-room office from his business suite in Camden and to serve as Security's representative. Security paid Huber $50 per month for the office and an additional $100 per month for secretarial services provided by one of Huber's employees. In October 1971, having obtained another New Jersey license, Security opened an office on the premises of Louis Malatesta, a home repair contractor in Millville, New Jersey. Malatesta provided this office space free of charge, apparently because much of the financing of Malatesta's home repair contracts came from second mortgage loans issued by Security.

All of the second mortgage loans in question were issued by Security to cover the costs of home improvements and repairs performed by Louis Malatesta. Malatesta and Huber were parties to an agreement whereby Malatesta would solicit home improvement and repair contracts from homeowners and Huber would arrange secondary mortgage financing through Security. In the typical case, Malatesta or his salesman would contact a

---

business, however, was revoked by the Department of Banking in 1974 and its mortgage holdings were assigned to defendant Fidelity Bank, a Pennsylvania corporation. Fidelity, in turn, has established defendant Kenbee Mortgage Company, a New Jersey corporation licensed under the Act, to service the mortgages.

[2] The complaint also sought a return of all mortgage payments. This claim has now been specifically abandoned except for those payments made during the course of this litigation.

homeowner to discuss the need for home improvements or repairs. After the homeowner agreed to have work done, Malatesta discussed costs and financing and obtained credit information from the prospective customer. This information was forwarded to Huber who would prepare the mortgage applications and send them to Leonard Moonblatt's Philadelphia office for approval. When an application was approved, Moonblatt would turn the application back over to Huber to process and, ultimately, to execute the secondary mortgage loan.

Moonblatt had retained Anthony Cavuto, a New Jersey and Pennsylvania attorney, to prepare the necessary legal documents for the mortgage transactions. Under a special agreement with Cavuto, however, Huber in fact prepared the documents required by the Act. Cavuto then reviewed the forms to insure that they were properly prepared. Pursuant to an understanding with Moonblatt, Cavuto billed each loan applicant $235 for his services. From this fee, he paid Huber a flat $100 for the closing plus $15 per hour for Huber's other "paralegal" work.[3]

Malatesta presided over the closings, most of which took place at Security's Millville office. The record contains several references to alleged irregularities in the closing procedures. For instance, several of the representative plaintiffs testified that Malatesta induced them to sign "closing" documents, required by the Secondary Mortgage Loan Act, without explaining to them the contents of the documents. One of the documents which Malatesta had them sign was a written statement attesting that the borrower was unable to obtain acceptable financing from the holder of every other existing mortgage on the property. Although each plaintiff dutifully signed the statement, several of them testified that the document was not explained to them.

---

[3]This Court publicly reprimanded Cavuto for sharing fees with a non-attorney. 81 *N.J.* 612 (1979).

Also admitted into evidence at trial were copies of testimony given by Malatesta before the Department of Banking during a 1974 investigation into Security's activities.[4] Malatesta testified before the Department that, at Huber's instruction, he created and recorded fictitious first mortgages in situations where none existed, so that Huber could process a Security secondary mortgage loan on the property. A prerequisite of secondary mortgage financing under the Act is the existence of a first mortgage on the subject property.[5]

Malatesta's 1974 testimony also revealed the existence of a "kickback" scheme between Malatesta and Huber with regard to all 162 loan transactions in question. Malatesta admitted to the Department of Banking that he paid Robert Huber a 15% kickback on every secondary mortgage loan arranged through Security. These payments purportedly totaled some $81,000 in cash. Malatesta, however, denied adding the cost of the kickbacks to his home repair prices. He said that he absorbed the 15% expense himself as a cost of doing business.

The trial court, in an opinion reported at 161 *N.J.Super.* 129 (Law Div. 1978), ruled that *N.J.S.A.* 17:11A–58 (which provides for the voiding of secondary mortgage loans not executed in full compliance with the Act) applied only against *licensees* who themselves violated the Act or ratified, in some way, the illegal actions of their representatives. *Id.* at 134. While Huber and Malatesta were representatives of Security, they were not officers, directors, stockholders or employees of Security and the Moonblatts had no knowledge of their illegal practices. Accordingly, the court held that Security's loans and mortgages could not be declared void and unenforceable either because of the 15% kickbacks or because of the fictitious first mortgages. *Id.* at 135.

---

[4]Louis Malatesta died in 1974, before the case was brought to trial.

[5]*N.J.S.A.* 17:11A–46(f).

The court found that plaintiffs understood as much of the loan transactions as they chose to, and that there was no indication that they were deprived of the opportunity to read the documents or obtain explanations of their import. *Id.* at 136. Further, it held that Security had complied fully with the requirements of the Truth in Lending Act, 15 *U.S.C.A.* § 1601 *et seq.*, Reg. Z, 12 *C.F.R.*, § 226.1 *et seq.*, and of the Secondary Mortgage Loan Act. *Id.* at 133.

The trial court did, however, grant the plaintiffs a measure of "equitable" relief. It found that Security had been careless in its selection and supervision of its representatives and further ruled that the 15% kickback had been passed on to all 162 plaintiffs by way of higher prices for their home improvements. Consequently, the court ordered that the original amount of all mortgage loans be reduced by 15%. Furthermore, the trial judge ruled that the victims of the fictitious first mortgage fraud were entitled to a lower interest rate coincident with a first mortgage. He therefore ordered that their interest rates be reduced to equal that of a first mortgage. *Id.* at 135–136.

The Appellate Division unanimously reversed the trial judge, holding that the licensee, Security, could not escape liability for the actions of its agent, Huber. 171 *N.J.Super.* 67 (App.Div. 1979). To hold otherwise would "make a mockery of the public policy declarations which inspired enactment of the Secondary Mortgage Act." *Id.* at 73. Before voiding any of the mortgages, however, the court addressed the trial court's treatment of the case as a class action. It noted that, while the trial judge assumed that the plaintiffs' suit constituted an appropriate class action, the record contained no order certifying the class. *Id.* at 72. Nor was their evidence concerning what notice, if any, was provided to the class pursuant to *R.* 4:32–2(b). Consequently, the panel concluded that the case was "properly maintainable only as a partial class action." *Id.*

Treating the cases involving fictitious first mortgages as a proper subclass under *R.* 4:32–2(d), the court proceeded to invali-

date every secondary mortgage created as a result of a fictitious first mortgage. These secondary mortgages, the Appellate Division observed, were " 'executed' without 'full compliance' " with *N.J.S.A.* 17:11A–58. *Id.* at 74 (quoting *N.J.S.A.* 17:11A–58).

The Appellate Division, however, found no support for the trial judge's finding that the 15% kickback was added to the cost of the home improvement contracts. Without proof of such facts, the court could not find a violation of *N.J.S.A.* 17:11A–58. The panel, therefore, remanded the case to the trial court on this issue in order to give the plaintiffs an opportunity to prove that Malatesta, in each instance, had added the kickback costs to the contract price. 171 *N.J.Super.* at 75.

Plaintiffs filed a petition for certification to this Court seeking review of that portion of the Appellate Division's ruling refusing to invalidate all of the secondary mortgage loans. We granted certification, 84 *N.J.* 383 (1980).

Defendants do not appeal from the Appellate Division ruling that Security was responsible for the actions of its agents Huber and Malatesta. Nor has the invalidation of the mortgage loans involving fictitious first mortgages been challenged. The issue before us is plaintiffs' contention that the evidence presented at trial established that all of the loans made by Security, and the mortgages securing them, involved substantial violations of the Secondary Mortgage Loan Act. Section 58 of the Act provides:

> Any obligation on the part of a borrower arising out of a secondary mortgage loan shall be void and unenforceable unless such ... loan was executed in full compliance with the provisions of this act. [*N.J.S.A.* 17:11A–58]

Three alleged violations of the Act are presented by plaintiffs in support of their position. First, they assert that the 15% kickback that Malatesta paid to Huber on each of the loans made by Security constituted a patent violation of *N.J.S.A.* 17:11A–46(h).[6] Second, they argue that the proofs showed, at

---

[6]The pertinent portion of *N.J.S.A.* 17:11A–46(h) prohibits a licensee from receiving any "broker's or finder's fee; commission; discount; ... [or] premium" in connection with a secondary mortgage loan.

least as to most of the plaintiffs who testified, that the contents of the documents they signed were not explained to them and they were unaware that they had signed statements required under the Act certifying that the holders of every other mortgage on their properties had declined to make the desired loans to them. Third, plaintiffs contend that the evidence presented at trial showed that Anthony J. Cavuto, the attorney retained by Security to handle the legal details of the loan transactions, allowed Huber, a non-lawyer, to do most of the work and paid the greater part of the fees received over to Huber. Plaintiffs do not allege that the legal fees which they were required to pay were excessive. Rather, they contend that the greater part of the fee went to a non-lawyer in violation of *N.J.S.A.* 17:11A–46(h) which provides, *inter alia*, that the reasonable attorney's fees which a borrower may be required to pay "shall not be paid to a person except an attorney authorized to practice law in this State."

■ We initially consider the extent to which this suit can be maintained as a class action pursuant to *R.* 4:32–1. While the Appellate Division correctly noted the absence from the record below, of an order certifying the class, we have since been informed by counsel for the plaintiffs that such an order was issued on May 13, 1976. Therefore, the case is properly before this Court as a certified class action. Regarding plaintiffs' alleged violations of the Act, the only proofs that are common to all of the remaining plaintiffs involve the attorney's fees question and the 15% kickback arrangement. With respect to these issues, the class was properly certified under *R.* 4:32–1(b)(3).

■ We find that the 15% kickback paid by Malatesta to Huber on each loan from Security to Malatesta's customers was a clear violation of *N.J.S.A.* 17:11A–48 which provides:

A borrower shall not be required to pay, directly or indirectly, *to a licensee or any other person*, a broker's or finder's fee, commission, discount, points or

premium for obtaining, procuring or the placing of a secondary mortgage loan. [*Id.*; emphasis supplied] [7]

The proofs showed, and the trial court found, that Malatesta paid these kickbacks to Huber to insure the approval of every application made by one of his customers. The trial court also found, in spite of Malatesta's testimony that he had absorbed the 15% kickbacks himself, that Malatesta must have recouped that payment in the contracts for home improvements with the borrowers. We agree with these findings. In the very nature of things Malatesta would have passed this cost of doing business on to his customers. The Appellate Division remand, requiring each plaintiff to show by competent proof that in fact Malatesta had done so, would impose an impossible burden of proof on plaintiffs. Moreover, a kickback to an agent of the lender is so contrary to the thrust of the Act, the main purpose of which is to correct abuses in the secondary mortgage loan industry, that it cannot be tolerated. It was undisputed that the plaintiffs merely endorsed their loan checks from Security over to Malatesta. Thus, there can be no doubt that the 15% kickback was paid from the monies plaintiffs had borrowed.

█ Security cannot escape responsibility for the kickback scheme by protesting that it was unaware of Huber's and Malatesta's actions. Proper supervision and monitoring would have disclosed the scheme. Suspicious circumstances should have alerted Security. Each loan check had been promptly endorsed over to Malatesta, who was providing Security with office space and his services in presiding over the closings without charge. Furthermore, Huber was Security's agent and representative and was vested with sufficient authority, real and apparent, to make the scheme possible. Apparently, Security did not instruct Huber that the collection of other charges in

---

[7]While we choose to rest our holding on a plain violation of the broad language of *N.J.S.A.* 17:11A–48, arguably the kickback scheme was equally violative of *N.J.S.A.* 17:11A–46(h), as asserted by plaintiffs.

violation of the statute was prohibited and took little, if any, precaution to monitor his activities although he was Security's alter ego throughout the course of events.

We conclude that the 15% kickbacks constituted a patent violation of *N.J.S.A.* 17:11A–48 for which Security was responsible. The notes and mortgages challenged by this appeal are hereby declared to be void and unenforceable pursuant to *N.J. S.A.* 17:11A–58.

In view of our holding on this question, it is unnecessary to address plaintiffs' other assertions of error.

Plaintiffs acknowledge that they are not seeking the return of any monies paid prior to the commencement of this suit. The record shows that by order dated July 2, 1976 the trial court established an escrow account for all mortgage payments made by the class members during the litigation. Following its decision, the trial court, on July 13, 1978, vacated the escrow account and ordered that the funds be turned over to defendants. The record does not indicate whether this latter order was stayed pending appeal. In any event, we hold that members of the class, in addition to the cancellation of their notes and mortgages, are entitled to a return of all mortgage payments made since the commencement of suit. The matter is accordingly remanded to the trial court for further proceedings in accordance with this opinion.

Reversed.

*For reversal and remandment* —Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance* —None.