569 A.2d 841

DONALD F. MORAN AND JUDY MORAN, HIS WIFE, PLAINTIFFS, v. AMERICAN FUNDING, LTD. AND MARINE MIDLAND BANK, N.A., DEFENDANTS.

GOLD TRENDS, INC., PLAINTIFF, v. DORA BENEDUCE AND MARIO BENEDUCE, HER HUSBAND; FRANK BENECKI AND ELAINE BENECKI; JOSEPH SHAPINSKI AND MARY SHA-PINSKI, HIS WIFE; MARTIN BURGER, TRUSTEE; ANTHONY PETRINO; NED BEVELHEIMER; AND LYNDHURST SZE, INC., D/B/A MR. WIN CHINESE SEAFOOD, DEFENDANTS.

Superior Court of New Jersey
Chancery Division Bergen County

Decided October 13, 1989.

*George J. Cotz* for plaintiffs Donald and Judy Moran (*Weber, Muth & Weber,* attorneys).

*Kenneth L. Winters* for defendants American Funding Ltd. and Marine Midland Bank, N.A. (*Carella, Byrne, Bain & Gilfillan,* attorneys).

*Kevin T. Rigby,* for plaintiff Gold Trends, Inc. (*Rigby & Cillick,* attorneys).

*David A. Biederman,* for defendants Dora Beneduce and Mario Beneduce (*Chester & Biederman,* attorneys).

*Michael L. Scherby,* for defendant Martin Burger, Trustee (*Contant, Contant, Schuber, Scherby & Atkins,* attorneys).

## OPINION

LESEMANN, J.S.C.

These related cases raise the question of whether a 1987 amendment to the Secondary Mortgage Loan Act, *N.J.S.A.* 17:11A–34 *et seq.* (hereinafter "The Act") should be applied

retroactively or only prospectively. That amendment (included within L.1987, C. 230) drastically changed the effect of a lender's non-compliance with the Act. Prior to its adoption, the Act provided that if a lender violated the Act while making a loan, the loan was void and the lender could recover neither the principal advanced nor any interest. The 1987 amendment modified that harsh result to permit recovery of the principal of the loan. For certain violations however, interest can still not be recovered and for other violations the Act specifies additional penalties.

The loans in both these cases were made before the 1987 change in the law, although both cases were filed thereafter. The applicable facts can be set out briefly.

## MORAN V. AMERICAN FUNDING, LTD.

In February, 1984 Donald and Judy Moran obtained a $50,000 loan from defendant, American Funding Ltd,[1] with the loan secured by a second mortgage on their home in Ridgewood, New Jersey. The Morans allege that at or before closing, they were required to pay charges for title insurance to cover the mortgagee's interest in the property, and also to increase the fire insurance coverage on their dwelling.

At the time of the transaction, the Act barred both of those charges by the lender. *N.J.S.A.* 17:11A–46 prohibited the charge for title insurance because the Act contained no authorization for such a charge, and thus the "catch all" prohibition of that section applied: *viz.,* the lender may not "contract for, charge, receive or collect" any one of a number of designated charges, nor may it "receive or collect ... any other thing of value other than charges authorized by this act". And *N.J.S.A.* 17:11A–49.1 specifically prohibited the lender from requiring

---

[1] The note, and the mortgage securing the loan were subsequently assigned to defendant Marine Midland Bank, N.A..

the mortgagors to increase their "property insurance" because of the loan.

The Morans made regular monthly payments on their loan through January, 1988. At that time, they refinanced their home but instead of paying off the American Funding mortgage, they filed this suit alleging that the loan was void and unenforceable. The amount in question has since been paid into court. Plaintiffs now move for summary judgment and claim that the pre 1987 law governs and bars any recovery—of principal or interest—by defendants.

For purposes of this motion only defendants "admit" that they did impose the charges and obligations alleged by plaintiffs. They assert a number of defenses including laches, estoppel, and unclean hands, and include as well a claim that the forfeiture provisions of the pre–1987 Act are unconstitutional.[2] They have counterclaimed seeking foreclosure of their mortgage and argue that, at most, plaintiffs are entitled to the lesser relief provided by the post–1987 Act (forfeiture of interest) and they must in any event repay the principal of the loan.

## GOLD TRENDS, INC. V. BENEDUCE

In August, 1986 defendants Mario and Dora Beneduce borrowed $130,000 from plaintiff Gold Trends, Inc. As collateral they executed two mortgages on properties located respectively in Lyndhurst and Rutherford, New Jersey. Both mortgages were subject to prior encumbrances and thus constituted second mortgages.

---

[2]The unconstitutionality claim was rejected by this court in *Connell v. American Funding Ltd,* 231 *N.J.Super.* 409, 417–418, 555 *A.2d* 745 (Ch.Div.1987), aff'd. 231 *N.J.Super.* 202, 555 *A.2d* 638 (App.Div.1989). Since American Funding, one of the defendants here, was also the defendant in *Connell,* plaintiff claims that it cannot now reargue that issue. However, American Funding correctly notes that the *Connell* case was decided in its favor and thus there was no reason for it to challenge the court's decision on the constitutional issue. Accordingly at trial the court will entertain the argument for whatever merit it may have.

Approximately one month later, in September 1986, the Beneduces borrowed an additional $160,000 from defendant Martin Burger as "trustee for an undisclosed principal." That loan was secured by two further mortgages, one a second mortgage on property in East Rutherford, and the other an additional mortgage on the same Lyndhurst property that formed part of the security for the Gold Trends loan.

On August 29, 1988, Gold Trends filed a foreclosure complaint against the Beneduces in which they also named Burger as a defendant.[3] The Beneduces defended by claiming that neither Gold Trends nor Burger is a licensed second mortgage lender and thus, under the Act as it read when the loans were made, both loans are "void and unenforceable".

Both Gold Trends and Burger acknowledge that they were not licensed under the Act and on the basis of that acknowledgment the Beneduces have filed a motion for summary judgment dismissing the foreclosure complaints. The mortgagees claim that the Beneduces may be guilty of fraud by accepting the loans with no intention of repaying them. And they argue further that, in any event, the less severe "penalty" provisions of the 1987 amendment should apply, rather than the harsher language in effect theretofore.

## THE PRIOR LAW

Before adoption of the 1987 amendment to the Act, section 58 thereof, *N.J.S.A.* 17:11A–58, provided that,

> Any obligation on the part of a borrower arising out of a secondary mortgage loan shall be *void* and *unenforceable* unless such secondary mortgage loan was executed in full compliance with the provisions of this Act. (emphasis added)

---

[3]The relationship between Gold Trends and Burger, who is an attorney at law of this state, and between the August and September loans is not clear. Gold Trends has filed a cross claim and claim for contribution against Burger alleging that he prepared certain of the loan documents in question and manipulated them to the detriment of Gold Trends. Those issues are not involved in the present motions.

In *Connell v. American Funding Ltd., supra,* 231 *N.J.Super.* 409 at p. 412, 555 *A.*2d 745, this court noted that prior cases have made clear that

those words mean just what they say: if a loan is subject to the act, and there was not full compliance with its provisions, the debt incurred by the borrower is void. The noncomplying lender can recover neither the principal he advanced to the borrower nor any interest.

To the same effect see, *e.g., Stubbs v. Security Consumer Discount Co.,* 85 *N.J.* 353, 426 *A.*2d 1014 (1981).

Further, that loss of principal and interest could be imposed not only because of the imposition of unlawful charges, but also for any failure to act "in full compliance with the provisions" of the Act. For example, and of particular significance in the *Gold Trends* suit here, if the lender was not licensed, the loan was treated as being in violation of the Act, and neither principal nor interest could be recovered. *Gottesfeld v. Kaminski, supra,* 216 *N.J.Super.* 679, 524 *A.*2d 872 (App.Div.1987).[4]

The purpose of the sanction contained in section 58—the policy underlying the provision—was also clear. As pointed out in *Connell, supra,* at p. 417, 555 *A.*2d 745,

Our courts have noted more than once that adoption of the Secondary Mortgage Loan Act was a response to abuses often perpetrated by "fly-by-night" operators preying on unsophisticated borrowers.... (citations omitted). The act was promulgated because local and out-of-state lenders were engaging in such transactions by fraud and chicanery. They procured borrowers through the means of false advertising. They then extracted unconscionable amounts of interest as well as exhorbitant fees.

It was to counter and deter those practices that the Legislature included section 58 in the Act. The "remedy" contained in that section was

harsh indeed. For a violation of the act, the lender can lose his entire loan and the borrower can find himself or herself with a huge windfall.... It is a deterrent, and undoubtedly a strong deterrent against unlawful conduct on the part of the lender. (*Connell, supra,* at p. 420–421, 555 *A.*2d 745).

---

[4]*Gottesfeld v. Kaminski* also held that the making of a single secondary mortgage loan, if done in a business context could constitute engaging in the secondary mortgage loan business and thus make the lender subject to all provisions of the Act. 216 *N.J.Super.* at pgs. 683–685, 524 *A.*2d 872.

See also, among a number of cases with similar statements, *Westervelt v. Gateway Financial Service*, 190 *N.J.Super.* 615, 620–621, 464 *A.*2d 1203 (Ch.Div.1983), noting that "the policy of the Act is to give generous protection to borrowers" and that, while forfeiture of all principal and interest "seems a harsh result, it was open to the legislature to decide that strong measures were needed to deal with a harsh business". See also, *HIMC Investment Co. v. Siciliano*, 103 *N.J.Super.* 27, 37–38, 246 *A.*2d 502 (L.Div.1968), from which the opinion in *Connell* quoted extensively.

## THE 1987 AMENDMENT

In 1987 the Legislature relaxed a number of the stringent limitations in the Act.

Prior thereto, a lender was prohibited from passing along most of the costs and expenses incurred in connection with a second mortgage loan. The lender could not require a borrower to pay for appraisal fees, search fees, title examination charges, surveys, title insurance or credit reports. The Act specifically prohibited many of those items and also included a "catch-all" prohibition against the lender's receiving or collecting any other thing of value other then the charges authorized by this Act. See, *N.J.S.A.* 17:11A–46(g).[5]

The 1987 changes specifically authorized a number of those previously prohibited charges. A new provision in the Act, *N.J.S.A.* 17:11A–44.9, said that a lender may "collect fees for title examination, abstract of title, survey, title insurance, credit reports, appraisals and recording fees when these fees are actually paid" by the lender to a third party.

The provisions concerning insurance on mortgaged property were also changed. Previously *N.J.S.A.* 17:11A–49.1 had said

---

[5] *N.J.S.A.* 17:11A–46(g) did permit the lender to collect reimbursement from the borrower for "a reasonable legal fee" actually incurred by the lender in connection with the loan.

that a lender could not require a borrower to increase insurance on the mortgage premises. The amended section, together with a new provision in section 49, *N.J.S.A.* 17:11A–49(b), now specifically authorized the lender to require increased insurance up to the amount of the new loan plus all prior liens.[6]

As noted, in addition to those provisions which relaxed prior restrictions on the lender, a significant change was made concerning the effect of a violation of the Act. Section 58 was repealed in its entirety. In its place a new section 59.1, *N.J. S.A.* 17:11A–59.1, was inserted, reading in its essential provisions as follows:

> If a licensee charges or collects interest, costs or other charges in excess of those permitted by the "Secondary Mortgage Loan Act" ... the licensee may collect only the principal amount of the loan, and may not collect interest, costs or other charges with respect to the loan. In addition, a licensee who knowingly and willfully violates any provision of that act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law.

Thus, as concerns the imposition of excessive or unlawful charges, the "penalty" provision of the Act has been relaxed considerably. Instead of a total loss of all principal and interest, a lender who imposes unlawful charges will lose only interest but may recover the "principal amount of the loan". And even if "willfulness" is shown, the added penalty might still be relatively light: a forfeiture equal to three times the amount improperly charged. There would still be no loss of the principal of the loan.

---

[6]At some points in their arguments the mortgagees seem to claim that these substantive amendments should be given retroactive effect so as to legitimize, after the fact, actions which were unlawful when they were taken. The analysis set out below would not lead to that result and such an argument would seem to have little support in logic, principle or case law. For the purpose of resolving the present motions the acts complained of are taken as violative of the Act and the issue of prospective vs. retroactive application is analyzed only in terms of the "penalty" to be imposed for those unlawful acts. If the mortgagees wish to pursue a broader claim of retroactive application, they may do so at the trials which will be held hereafter.

With respect to the penalty for engaging in the second mortgage loan business without a license, the 1987 amendment also made a significant change. Whereas section 58 had contained all inclusive language, and referred to any loan which was not "in full compliance" with the Act, the new section 59.1 is more restrictive. It provides for a loss of interest only if the lender "charges or collects" unlawful fees or other payments from the borrower. That language does not address the licensing issue, and thus section 59.1 would not seem to call for a forfeiture of interest because the lender lacks a license. For that offense, a separate sanction is set out in *N.J.S.A.* 17:11A–59—a penalty of $3,000 for each offense, with each separate loan constituting a separate offense.

## PROSPECTIVE VS. RETROACTIVE APPLICATION

As noted, the question presented is whether the 1987 repeal of section 58 of the Act, and its replacement by the less severe provisions just described should be applied to the acts here in question which occurred in 1984 or 1986. Or, as the question is often posed, should the 1987 enactment be given retroactive or only prospective effect.

New Jersey follows the general rule of statutory construction that favors prospective application of statutes. *Gibbons v. Gibbons,* 86 *N.J.* 515, 432 *A.*2d 80 (1981); *Grippo v. Schrenell and Co.,* 223 *N.J.Super.* 154, 538 *A.*2d 404 (App.Div.1988); *Ryan v. Biederman Industries,* 223 *N.J.Super.* 492, 538 *A.*2d 1324 (App.Div.1988); *Miller v. Hall Bldg. Corp.,* 210 *N.J.Super.* 248, 509 *A.*2d 316 (L.Div.1985). As noted in *Gibbons,* the rationale for the rule is the "fundamental principle ... that retroactive application of new laws involves a high risk of being unfair." 86 *N.J.* at p. 522, 432 *A.*2d 80. However, as also noted in *Gibbons,* the general proposition is not cast in stone. It is a "sound rule of statutory interpretation" but it is no more than that and it should not be "applied mechanistically to every case." *Ibid.*

In *Gibbons,* our Supreme Court set forth three exceptions to the basic rule of prospectivity.

The first such exception arises when the Legislature has indicated its intention that the statute should be applied retroactively. That "expression of legislative intent may be either express, that is, stated in the language of the statute or in the pertinent legislative history, ... or implied, that is, retroactive application may be necessary to make the statute workable or to give it the most sensible interpretation." *Gibbons,* 86 *N.J.* at 522, 432 *A.*2d 80.

The second situation in which a court may apply a statute retroactively is where the statute is "ameliorative" or "curative". *Id.* at 523, 432 *A.*2d 80. Those two terms have not received consistent treatment by our courts, and as discussed below, decisions have not even been consistent as to whether they represent two different and distinct exceptions or just one.

The third circumstance in which the *Gibbons* court held that a statute may be given retroactive application is that in which the expectations of the parties warrant retroactive application. *Gibbons,* 86 *N.J.* at 523, 432 *A.*2d 80. *See also, Grippo,* 223 *N.J.Super.* at 162, 538 *A.*2d 404. This consideration focuses on the parties' legitimate expectations and rights, and the effect that retroactive application may have upon those rights and expectations.

Finally, even if a statute qualifies for retroactive application under one of those exceptions, the Court in *Gibbons* cautioned that retroactive application must not "result in 'manifest injustice' to a party adversely affected by such an application of the statute". *Gibbons,* 86 *N.J.* at 523, 432 *A.*2d 80. There can be no retroactive application if "the affected party relied, to his or her prejudice, on the law that is now to be changed" where "the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively." *Id.* at 523–24, 432 *A.*2d 80.

The mortgagees here argue that retroactive application of the 1987 amendment is justified under any one or all three of the exceptions set out in *Gibbons*. They also claim that such application does not run afoul of the mandate in *Gibbons* that there be no retroactive application if it will produce injustice. They claim that retroactive application is consistent with the legislative intention; that the amendments are both curative and ameliorative; that retroactive application accords with the intentions of the parties, and that there will be no inequity in applying the 1987 amendment to the loans here in question.[7]

This court agrees with the substance of those contentions; that retroactive application of the 1987 amendment is consistent with the legislative intent; that the amendment is at least "ameliorative" if not "curative" as well; and that no unfairness or inequity will result therefrom, either because of a result inconsistent with the parties' intention, or for any other reason.

As noted above, the application of section 58 of the Act, as it existed before 1987, could produce extraordinary, and often inequitable, results.

For any violation by a lender, no matter how seemingly insignificant and even if unintentional, the borrower found himself or herself with a windfall (free of the obligation to repay what often was a substantial debt) and the lender lost the entire amount loaned. The decision by the Legislature to inflict that penalty, despite the obvious potential of inequity in particular cases, clearly represented a determination that such a measure was necessary to halt the unscrupulous practices which had been rampant in the second mortgage business. The necessary end, in other words, justified the Draconian means.

---

[7] The mortgagee in *Moran v. American Funding* also submits an argument based on characterizing the 1987 amendments as dealing with remedy rather than substantive rights. Although the issue could be approached on that basis, such an analysis does not seem to add anything significant to the approach followed in *Gibbons*, which is the basis on which the issue is discussed here.

In 1987, however, the Legislature determined that the harsh penalty of total forfeiture was no longer necessary. By repealing section 58 and inserting the new provisions of section 59.1, it expressed its conclusion that the forfeiture of interest alone, together with the possible obligation to repay three times the amount of any unlawful charge was an adequate penalty and an adequate deterrent. The legislative policy could be accomplished without the risk of inequity and unfairness that had theretofore inhered in section 58.

To grant that amendment only prospective effect would be inconsistent with the legislative interest that led to its adoption. It would continue the windfall potential and other inequities of section 58 after the Legislature had decided they are no longer necessary in order to effect the policies of the Act. It would keep in place the "Draconian means" of accomplishing the desired end after the Legislature had concluded that less drastic means were sufficient, and more suitable, to accomplish that end.

In view of the legislative intent reflected in the 1987 amendments, it is clear that retroactive application is consistent with that intent. As in *Gibbons*,

> giving the statute retroactive application will fulfill the essential purpose of retroactivity, "to effectuate the current policy declared by the legislative body" (*Gibbons, supra*, at pp. 524–525, 432 *A.*2d 80).

*C.f., Rothman v. Rothman*, 65 *N.J.* 219, 223–224, 320 *A.*2d 496 (1974) applying the equitable distribution statute retroactively because, among other reasons, to refuse to do so would delay the full effect of the statute for an inordinate time.

This then, is the kind of case discussed in *Gibbons* where the legislative intent to accord retroactivity appears not from any express statement in the Act itself or its legislative history, but rather where the intent is implied because retroactive application is

> necessary to make the statute workable or to give it the most sensible interpretation (*Gibbons, supra*, at p. 522, 432 *A.*2d 80).

Retroactive application is also appropriate here under the second exception set out in *Gibbons*—"the statute is ameliorative or curative".

Our courts have not always been consistent in their treatment of this principle. Indeed, decisions have even differed in characterizing the terms "ameliorative and curative" as synonymous terms constituting one single exception, or as representing two distinct and separate exceptions. See discussion in *Kendall v. Snedeker*, 219 *N.J.Super.* 283, 530 *A.*2d 334 (App. Div.1987). See also, *Grippo v. Schrenell and Co.*, 223 *N.J.Super.* 154 at p. 163, 538 *A.*2d 404, noting the inconsistency between the treatment in *Miller v. Hall Bldg. Corp*, 210 *N.J.Super.* 248, 509 *A.*2d 316 (L.Div.1985), regarding "ameliorative and curative" as a single exception, and the conclusion in *Kendell v. Snedeker, supra*, that the two are distinct and different exceptions.

In *Gibbons*, Justice Pashman seemed to give a broad reading to the term "curative", suggesting that an amendment may be considered "curative" if it

reflects the Legislature's attempt to improve a statutory scheme already in existence. (*Gibbons*, at p. 524, 432 *A.*2d 80)

Under that broad definition of "curative" the 1987 amendment would certainly seem to qualify for retroactive application. Clearly it reflects a legislative determination to improve a statutory scheme already in existence, and if that is the sole criterion, then the repeal of section 58 would certainly constitute a curative amendment. Whether the term "curative" should indeed be given that broad a scope, however, is not an issue that need be pursued here.[8] For clearly the amendment

---

[8]Literal application of the quoted language would seem to justify retroactive application of almost any amendment to a pre-existing legislative scheme when the bulk of the scheme remains intact with only specific changes effected by the amendment. If that be so, the focus would then have to be on what might be termed the "negative mandate" of *Gibbons:* that there be no retroactive application if it would lead to an unfair or inequitable result.

here does qualify as "ameliorative", and on that basis merits retroactive application.

The ameliorative justification for applying a statutory amendment retroactively was first discussed in *In Re Smigelski*, 30 *N.J.* 513, 527, 154 *A*.2d 1 (1959). There the Court applied the principle to justify retroactive application of a statute which limited the maximum confinement period for a juvenile offender. The Court cited with approval the New York case of *People v. Oliver*, 1 *N.Y*.2d 152, 159–160, 151 *N.Y.S*.2d 367, 373, 134 *N.E*.2d 197, 201–202 (Ct.App.1956), where the applicable principle was set out:

> [W]here an ameliorative statute takes the form of a reduction of punishment for a particular crime, the law is settled that the lesser penalty may be meted out in all cases decided after the effective date of the enactment, even though the underlying act may have been committed before that date.... A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.

Those principles are clearly applicable here, even though we are dealing with a civil rather than a criminal statute.[9]

As discussed above, section 58 was clearly a "penalty" provision. It was repealed and replaced by other provisions which call for lesser penalties. That legislative decision to mitigate

---

[9]*In Re Tenure Hearing of Grossman*, 127 *N.J.Super.* 13, 35–36, 316 *A*.2d 39 (App.Div.1974) certif. den., 65 *N.J.* 292, 321 *A*.2d 253 (1974) is a pre-*Gibbons* case which applied the ameliorative principle in a civil case without using that precise term. There a statute, had allowed a school board to cease paying salary while a teacher was suspended pending a hearing concerning termination of employment. After the teacher in question had been suspended the statute was amended to require full payment of salary pending such a hearing. The Court found that "the obvious intent and purpose of the amendment was to alleviate the financial plight of those affected". It thus applied the amendment retroactively, citing in support of its conclusion *People v. Oliver* and *In Re Smigelski, supra.*

the penalty for violating the Second Mortgage Act represents a determination that total forfeiture of principal and interest is not necessary, and that a lesser penalty is sufficient to meet the legislative end of deterring and preventing violations of the Act. Once that determination has been made, there is nothing to be gained by imposing the harsh sanction of section 58 to acts which occurred prior to the legislative pronouncement but which reached the court some time thereafter. To do so "would serve no purpose other than" continuing the potential injustice which inhered in the prior legislation.

The 1987 amendment, in short, represents the essence of an ameliorative amendment and under the rule set out in *Gibbons*, applied in *Smigelski* and further discussed in *Kendall*, the amendment should be given retroactive effect.[10]

The third exception to the general rule against retroactive application of a statute also favors application of the 1987 amendment to this case: the "expectations of the parties" are consistent with such application. Certainly it is reasonable to assume that when the parties entered into these transactions they intended to fulfill the obligations they undertook—specifically, that the borrowers intended to repay the amount borrowed. And giving effect to the 1987 amendments comes closer to effecting those intentions and expectations than would an insistence on applying the prior law.

---

[10] In *Kendall v. Snedeker, supra,* 219 *N.J.Super.* at pp. 286–287, 530 *A.2d* 334, the court noted that the ameliorative principle is one which applies only in a criminal case, to "reduction of a criminal penalty". However, that statement was made in the context of a discussion of whether the terms curative and ameliorative represent one single, or two separate, exceptions to the general rule of prospectivity. The court was not discussing a distinction between a penalty in a criminal case and a penalty in a civil case. There is no reason why the proposition set out in *Oliver,* cited with approval in *Smigelski* and discussed in *Kendall v. Snedeker,* should not apply equally in a civil penalty case, and there is no reason to interpret the dicta in *Kendall* as being inconsistent with that statement. See, *In Re Tenure Hearing of Grossman, supra.*

As to the "negative mandate" of *Gibbons*, that a statute should not be applied retroactively if such application would result in "manifest injustice", it is difficult to see how any such argument could be made here. It is not claimed that any of the borrowers relied on the forfeiture provisions of section 58 when they made their loans and signed their mortgages. Indeed absent some extraordinary circumstances, any such hypothesized claim would seem frivolous, and even if accepted, would hardly constitute an equitable consideration arguing against retroactivity.

In short, retroactive application here will do nothing more than call upon the parties to comply with the obligations they undertook, consistent with their original understanding, and will fulfill their original expectations. There will be no injustice, "manifest" or otherwise.

In conclusion then, this Court finds that the 1987 repeal of section 58 of the Secondary Mortgage Loan Act applies to these cases. The motions for summary judgment to declare the mortgages in question void and unenforceable are denied.

With respect to *Moran v. American Funding*, a trial will be necessary in order to determine whether American Funding did commit violations of the Act when it made its loan to the Morans, and if so, whether those violations were committed "knowingly and willfully". If there were violations, and unless the defenses asserted by the defendants are shown to have merit, the effect of the violations will be determined based on the Act as amended—with section 59.1 in effect and not section 58.[11]

With respect to *Gold Trends v. Beneduce*, since the mortgagees admit they were unlicensed, the remaining issues will focus on the effect of that non-licensing under the post–1987 Act:

---

[11]A claim that the mortgagee charged excessive interest based on an allegedly improper use of the so-called "Rule of 78's" can also be raised and will be resolved at trial.

*viz.*, whether the penalty for such a violation is limited to the $3,000 per offense set out in the newly amended *N.J.S.A.* 17:11A–59, and also on the validity of any affirmative defenses asserted.

The attorneys for the mortgagees in each case will kindly submit an appropriate form of order which will provide for a pretrial conference to be held in the near future.