Fuld, J.
On April 3, 1945, defendant, then 14 years old, killed his two-year-old brother, and a week later he was indicted by the Grand Jury of Bronx County for murder in the first degree. He pleaded not guilty and shortly thereafter — following a report from Bellevue Hospital that he was “ in such a state of * * * insanity as to be incapable of understanding the charge against him or the proceedings or of making his defense ” (Code Grim. Pro., § 662-b; Penal Law, § 1120)—he was committed to Matteawan State Hospital, where he remained for more than nine years. At the end of that period, in October of 1954, he was found ‘[1] no longer * * * incapable of understanding the charge against him or of making his defense thereto ” (Code Grim. Pro., § 662-b), and some months later he was brought to trial upon the 1945 indictment.
From the confession which he made soon after the killing, as well as from ample supporting proof, it appears that defendant arose, shortly after midnight, from the couch on which he slept, obtained a butcher knife from the kitchen, removed his brother from his bed, “laid him on the floor” and stabbed him several times in the chest and back; then carried the child to the bathroom, placed him in the tub, filled it with water and kept him immersed for 5 or 10 minutes; and then, after returning him to his bed, defendant set fire to the bedclothes. The deed done, he went back to his couch, remained a few minutes, got up again, went to a closet, packed his clothes in a suitcase with some idea of running away, went downstairs until the fire engines arrived and then proceeded to a police station where he told the officer on duty that he had stabbed and killed his brother. What he did, defendant stated, was prompted, not by any anger towards or dislike for his brother, but because he was ‘ ‘ mad ’ ’ at his mother and wanted ‘ ‘ to get even ’ ’ with her.
Defendant took the stand. He testified that, at the time of the homicide, he had been living with his mother, his little brother, his sister, her husband and their child; that his father, whom he had never seen, was confined, as “ insane,” in Central *155 Islip Hospital; that an aunt (a sister of his father) was an inmate of Rockland State Hospital, and that his sister, who had forced him to commit acts of sodomy with her, was committed to Pilgrim State Hospital while he was in Matteawan. He acknowledged that he had killed his brother in the manner described above, after first attempting to commit suicide by turning on the gas. He declared that he had heard voices which told him “ To set fire to the building and to kill * * * To kill the family ” and then “ dismember the bodies ”; he did not go through with that plan because he became ‘[1] panicky. ’ ’
In an attempt to show that defendant was insane at the time he committed the homicide, the defense called four psychiatrists, but only one of them addressed himself to the question rendered vital and operative by section 1120 of the Penal Law. It was the opinion of that psychiatrist, Dr. Kwalwasser, who had been designated by the court, that defendant knew neither the nature and quality of his act nor that it was wrong. Dr. Kaplan, the sole expert called by the District Attorney, expressed a contrary view. In addition to interposing the defense of insanity, defendant maintained that, by reason of section 486 of the Penal Law, he could not be tried for murder since he was but 14 years old when the homicide occurred. The trial court denied his motion to dismiss the indictment upon that ground, and the jury, returning a verdict of first degree murder, following a charge on the subject of insanity, necessarily found defendant sane.
We treat but one of the several points advanced by able and conscientious court-assigned defense counsel, since it is dis-positive of the appeal, requiring as it does dismissal of the indictment.[1]
Section 486 of the Penal Law was amended in 1948 (L. 1948, ch. 554). Before that amendment, a child over 7 and under 16 could be prosecuted for murder or any other crime punishable by death or life imprisonment. (Penal Law, §§ 486, 2186; see People v. Murch, 263 N. Y. 285; People v. Roper, 259 N. Y. 170.) After the amendment, a child under the age of 15 may be subjected only to treatment as a “delinquent” and not to punishment as a criminal. In other words, the effect *156 of the modification is that no child of 14 or less may be charged with or prosecuted for any crime, even though it be punishable by death. (See, also, Penal Law, § 2186, as amd. by L. 1949, ch. 388.)
To be somewhat more specific, section 486 dealt and deals with the treatment of children found to be “ neglected ’ ’ or “ delinquent.” It provided and provides that any child so denominated is to be brought before the court for commitment to a charitable reformatory or other institution. And, though the definition of a “ neglected ’ ’ child was not changed by the amendment, the definition of a “ delinquent ” child was; prior to 1948, it included any child over 7 and under 16 who committed any act which, if perpetrated by an adult, would be a crime, ‘ ‘ not punishable by death or life imprisonment ’ ’. The Legislature removed those quoted words and substituted in their place an exception excepting “ any child fifteen years of age who commits an act which if committed by an adult would be punishable by death or life imprisonment ”. As a result of the amendment, the relevant portion of section 486 reads in this way:
‘ ‘ Any child actually or apparently under the age of sixteen years who is found:
“1. To be neglected; or,
“2. To be delinquent; or,
í i g # % *
‘[1] Must be brought before a proper court which, unless other disposition shall be made of the case as provided by law, may commit the child to any incorporated charitable reformatory, or other institution, and when practicable, to such as is governed by persons of the same religious faith as the parents of the child.
* * *
‘ ‘ The word ‘ delinquent ’ shall include any child over seven and under sixteen years of age (a) who violates any law of this state or of the United States or any municipal ordinance or who commits any act which if committed by an adult would be a crime, except any child fifteen years of age who commits an act which if committed by an adult would be punishable by death or life imprisonment ”
unless an order removing the action to the children’s court is made pursuant to certain specified sections of the Code of *157 Criminal Procedure. (Italics indicate matter added by amendment.)[2] As already noted, the effect of the amendment was to prevent the State from prosecuting a child under 15 for any act which he may have committed; he was to be treated, for misconduct no matter how egregious, as a delinquent and not punished as a criminal. (Cf. State v. Monahan, 15 N. J. 34.)
When he signed the bill effecting this amendment, as well as several other related and implementing bills, Governor Dewey issued a memorandum in which he declared (Public Papers of Governor Dewey [1948], pp. 225-226):
“ These five measures bring about a major advance in our legal concepts of crime and of juvenile delinquency. By redefinition they bring to an end the classification of any child under the age of 15 as a criminal.
* * #
“ It is a shocking thought that under our criminal statutes a child of 7 may be guilty of crime and conceivably could be electrocuted for the crime of murder. Of course, no enlightened community would permit such a situation to occur. * * * The time is well overdue to state in the law in no uncertain terms that a child under the age of 15 has no criminal responsibility irrespective of the act involved.
* * #
“It is particularly gratifying to me that we in the State of New York are making this important advance in our laws, an advance which recognizes and proclaims the dignity of human beings, in a period in which it is frequently difficult to separate the institutions of barbarism from those of civilization.”
We must decide, of course, whether the 1948 amendment, removing the acts of children under 15 from the category of crimes, should be read to apply to the act of this defendant, committed before its enactment, when he was only 14 years old.
The general rule is clear. Statutes dealing with matters other than procedure are not to be applied retroactively absent a plainly manifested legislative intent to that effect. (See, e.g., *158 Garzo v. Maid of Mist Steamboat Co., 303 N. Y. 516, 522; Shielcrawt v. Moffett, 294 N. Y. 180, 188; Addiss v. Selig, 264 N. Y. 274, 281; Jacobus v. Colgate, 217 N. Y. 235, 240.) The rule recognizes that people guide their affairs in the light of existing laws and that it would he unfair to defeat the expectations, rights and liabilities arising under those laws by subsequent retroactive changes. Particularly in the area of criminal law, statutes which condemn an act innocent when done, or increase the punishment for previously committed crimes, have always been regarded as oppressive and prohibited, as ex post facto laws, by the Federal Constitution. (U. S. Const., art. I, § 10; see, e.g., People ex rel. Pincus v. Adams, 274 N. Y. 447, 454-455; People v. Hayes, 140 N. Y. 484, 490-491; Calder v. Bull, 3 Dallas [U. S.] 386, 390.)
On the other hand, when a criminal statute is repealed or a penalty reduced, different considerations are involved. In such a case, there is no problem of preserving private rights and liabilities; and, since the legislation is ameliorative, there is no danger of ex post facto oppression. (See People v. Hayes, supra, 140 N. Y. 484, 491.) The question becomes, rather, whether the State should retain the right to punish offenses committed before the legislative change under the more stringent law then in effect.
At common law, it was generally held that the repeal or amendment of a penal statute barred any further prosecution under that statute for violations committed before the repeal, and abated all pending prosecutions which had not reached final judgment. (See, e.g., Hartung v. People, 22 N. Y. 95, 99-103; United States v. Reisinger, 128 U. S. 398, 401; see, also, 1 Sutherland, Statutory Construction [3d ed., 1943], § 2046, pp. 529-530; 50 Am. Jur., Statutes, § 568, p. 569.) Of the many reasons advanced to explain that rule (see Levitt, Repeal of Penal Statutes and Effect on Pending Prosecutions, 9 A. B. A. J. 715), the most plausible and pervasive was that the repeal reflected a “ legislative will ” that offenses against the statute, though committed while it was still in force, should ‘ ‘ no longer be regarded criminal, and * * * [should] not be punished under the repealed statute.” (Vincenti v. United States, 272 F. 114, 115; see Anonymous [Case No. 475], Fed. Cas. No. 475, Yol. 1, pp. 1032, 1034; see, also, Note, 89 A. L. R. 1514.) Strictly *159 applied, as it was, the common-law rule often worked to produce unjust results and defeat the obvious legislative design. Thus, when, following the repeal of an old statute, a new one was enacted treating the crime more strictly, an offense committed before the change might go entirely unpunished. The repealed statute could not be availed of, for in legal contemplation it no longer existed. The new, replacing statute, being more burdensome, could not be relied upon, for the prohibition against ex post facto laws prevented its application to acts committed before its enactment. (See Hartung v. People, supra, 22 N. Y. 95; same case, 26 N. Y. 167, 28 N. Y. 400; People v. Cleary, 13 Misc. 546, 552-553; see, also, 1 Wharton on Criminal Law [12th ed., 1932], § 42, pp. 59-60, and n. 14; Note, 167 A. L. E. 845.)
In order to avoid this result, “ saving clauses ” were inserted in repealing laws, in order to preserve the State’s right to prosecute offenses previously committed under the repealed statute. Indeed, in 1892, New York enacted a general saving clause applicable to all legislation (see 1 McKinney’s Cons. Laws of N. Y., Book 1, Statutes, §§ 412-413, pp. 443-446), and today it appears in sections 93 and 94 of the General Construction Law. Section 93 declares, “ The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or * * * penalty, forfeiture or punishment incurred prior to the time such repeal takes effect, ’ ’ and section 94 provides that all proceedings commenced and pending at the time a statute is repealed [1] ‘ may be prosecuted * * * to final effect in the same manner as they might if such provisions were not so repealed.” These sections-, however, like all provisions of the General Construction Law, are not to be applied when the “ general object ” of the statute, “ or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended ”. (General Construction Law, § 110; see People v. Roper, 259 N. Y. 635.) They have been read by this court to [1] ‘ provide merely a principle of construction ”, which governs “In the absence of * * * contrary intent ” and which applies “ with special force to statutes which otherwise would be ex post facto or would deprive persons of substantial rights.” (People v. Roper, supra, 259 N. Y. 635.) And? indeed; where an ameliorative statute takes the form of a *160 reduction of punishment for a particular crime, the law is settled that the lesser penalty may be meted out in all cases decided after the effective date of the enactment, even though the underlying act may have been committed before that date. (Penal Law, § 38; see People v. Roper, supra, 259 N. Y. 635; People v. Hayes, supra, 140 N. Y. 484; People ex rel. Pincus v. Adams, supra, 274 N. Y. 447, 457; People v. Spagnolia, 260 App. Div. 551; see, also, 1 Sutherland, op. cit., § 2048, pp. 534-535; 1 Wharton, op. cit., § 42, p. 59.)
This application of statutes reducing punishment accords with the best modern theories concerning the functions of punishment in criminal law. According to these theories, the punishment or treatment of criminal offenders is directed toward one or more of three ends: (1) to discourage and act as a deterrent upon future criminal activity, (2) to confine the offender so that he may not harm society and (3) to correct and rehabilitate the offender. There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution. (See Michael & Wechsler on Criminal Law and its Administration [1940], pp. 6-11; Note, 55 Col. L. Rev., pp. 1039, 1052.) A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.
With these thoughts in mind, we turn to the present case. Since the 1948 amendment was an ameliorative one, there is, of course, no constitutional problem and the question is solely one of legislative design. There are no express instructions in the statute as to its effect on prior behavior, but the very nature of the legislation, its “ general object ” and the evidence afforded by Governor Dewey’s accompanying memorandum (supra, p. 157) forcefully stamp it a statute whose more benign provisions should be applied to all offenders not tried and sentenced by the time it became law,
*161 The amendatory statute unquestionably falls within the category of legislation reducing penalties for criminal activity. Its object and effect were to relieve children of a certain age from punishment as criminals, and subject them, instead, to corrective treatment as juvenile delinquents. What this court wrote in 1932 about the beneficent purpose of section 486 as it then read is equally applicable to the statute as amended: [1] ‘ The law, in its mercy, demands that a child should be subject to such correction as may tend to remove the causes which have led the child to commit acts inimical to society; where it might demand that an adult committing the same acts should be visited with punishment of deterrent effect.” (People v. Roper, supra, 259 N. Y. 170, 177.)
By enacting this legislation, the Legislature has determined that, in dealing with children, the preventive purpose of the Penal Law cannot be served effectively by those afflictive sanctions which are aimed primarily at the adult offender and designed for general deterrence. The State has chosen to direct its efforts toward seeking and averting the causes of juvenile delinquency, on the premise that erring children, still in the formative years of their lives, will respond to remedial and corrective efforts.[3] The Legislature has, in effect, simply concluded that a more humane treatment suffices to subserve the law’s proper ends in treating juvenile offenders. To preserve the criminal penalties previously in force and to inflict them after the law-making body has so determined and declared would serve no justifiable purpose.
That the change accomplished is more fundamental than a mere reduction of punishment for a given crime, that it relieves children of 14 or less from criminal responsibility altogether, does not affect its character as a legislative mitigation of punishment. Indeed, it furnishes additional basis for applying such a statute in all subsequent proceedings. It would be anomalous to give retroactive force, as the law does, to a legislative judgment reducing the penalty for a particular crime *162 and to deny such effect to a judgment which dispenses with all penalty, stricti sensu, invoking only the corrective processes employed by the children’s court. Retroactivity would certainly be conceded if the Legislature had, in 1948, done no more than provide that children under 15 may not suffer the death penalty. Consequently, when the Legislature elected to make larger concessions to the claims of humanity advanced on behalf of the offender under 15, none can doubt that a far stronger case for retroactive application is made out.
In People v. Roper (supra, 259 N. Y. 170), this court came very close to anticipating the very problem now before us, clearly indicating that a statute limiting the area of criminal responsibility for children should receive a retroactive construction. After the 15-year-old Roper had been indicted for murder in the first degree, committed while engaged in a robbery, the Legislature reduced the penalty for first degree robbery, previously punishable by life imprisonment (p. 179). The consequence of that was that robbery was removed, by reason of section 486, from the category of crimes of which a child under 16 could be guilty. It was the court’s view that the “ felonious intent,” requisite for guilt of murder, could not be predicated upon guilt of robbery, since the defendant could not be subjected to prosecution for that crime, even though he had actually committed the robbery and the homicide before the statute had been changed. 11 The effect ’ ’ of the amendment, the court held, ‘ ‘ is the same as if the Legislature had expressly declared that no child under the age of sixteen years can be guilty of robbery in any degree * * *. In the absence of a clause excluding from its provisions offenses previously committed, the law as amended applies in all trials held thereafter, even for offenses previously committed.” (259 N. Y., at pp. 179-180; see, also, case on motion for reargument, 259 N. Y. 635, supra.)
The 1948 amendment, in like manner, narrows the area of a child’s criminal responsibility, and there is every reason to give it similar effect in all cases thereafter tried, even for offenses previously committed. If in 1948 it was “ a shocking thought ” that a child between 7 and 15 “ may be guilty of crime and conceivably * * * electrocuted for the crime of murder ” (Public Papers of Governor Dewey, op. cit., p. 225), it was no less shocking to try this defendant for murder in 1955, *163 simply because Ms childhood offense occurred before the legislative change.[4]
It may be well to note that the construction that we are here according to the amendment cannot be applied in favor of an offender tried and sentenced to imprisonment before its enactment. (See People ex rel. Downie v. Jackson, 286 App. Div. 1131, motion for leave to appeal denied today, April 26, 1956, 1 N Y 2d 642.) Tliis inevitably follows from the settled rule that, once final judgment has been pronounced, a change in the law “ does not arrest or interfere with execution of the sentence.” (Welch v. Hudspeth, 132 F. 2d 434, 436; see, also, People ex rel. Ouariglia v. Foster, 275 App. Div. 893; People ex rel. Paster v. Palmer, 274 App. Div. 856; 1 Sutherland, op. cit., § 2046, p. 529 and n. 2.) Whenever the Legislature alters existing law, a certain measure of inequality is bound to ensue. Where the change is ameliorative and reflects a judgment that the earlier law was unduly harsh or unjust, a court should not withhold the benefits of the new statute to one tried after its passage, merely because it is powerless to extend them to those already convicted.
Finally, when the Legislature has seen fit to abolish the death penalty for a class of offenders, nothing but the very clearest legislative direction should lead us to conclude that it intended the prior law to apply in any subsequent trial. As this court observed (Hartung v. People, supra, 22 N. Y. 95, 103), in discussing legislation which repealed a statute providing for capital punishment, if anything is plain “upon reason,” it is “ that life cannot be taken under color of law, after the only law by which it was authorized to be taken has been abrogated by the law-making power.”
*164 The judgment should he reversed and the indictment dismissed. Whether defendant should be released or confined to an institution depends upon further consideration and. evaluation of his mental condition. (See, e.g., Mental Hygiene Law, §§ 74, 75, 82.) This circumstance, however, has nothing to do with the criminal charge.

. It may be pertinent to note that we are all agreed that the errors to which Judge Froessel calls attention in his dissent (pp. 166-167) were serious and would, in any event, have called for a reversal and a new trial.

. By reason of the last proviso, even a child of 15 may be treated as a “ delinquent ” — immune from criminal prosecution — if the requisite order of removal is obtained.

. Obviously, this is quite different from a change in law abolishing a crime, or altering its definition, where the State may prefer to retain the right to prosecute for the act previously committed in deliberate defiance of the law as it then existed. (Cf. People v. England, 91 Hun 152; United States v. Reisinger, supra, 128 U. S. 398; see, also, Levitt, op cit., p. 715.)

. Amended section 486 applying, defendant may not be prosecuted for any crime, and it is exceedingly doubtful whether he may be proceeded against in the children’s court, since he has passed the age of 21. (See N. Y. City Dom. Rel. Ct. Act, § 61, suhd. 1; but cf. Johnson v. State, 18 N. J. 422, 432.) However, if this defendant may not be charged in the children’s court, because he is now over 21, that would also be the result if the killing had occurred in 1949, after the statute had been amended, and a 14-year-old offender was likewise confined in an institution for nine years. The consequence remarked, therefore, is one which necessarily stems from the statutory scheme and does not depend upon the construction given the amendment.