******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., concurring and dissenting. I respectfully dissent. Although I agree with part I of the majority opinion, which concludes that the Appellate Court properly determined that the trial court did not abuse its discretion in admitting Raymond Driscoll's testimony because the testimony was relevant and not unduly prejudicial, I disagree with part II of the opinion, in which the majority concludes that the amelioration doctrine should not be employed in the present case so as to apply No. 09-138, § 2, of the 2009 Public Acts (P.A. 09-138), retroactively to the defendant, Albert Kalil. In my view, the savings statutes relied upon by the majority do not apply in the context of P.A. 09-138. Therefore, I respectfully dissent from part II of the majority opinion.

The amelioration doctrine dictates that P.A. 09-138 should be applied retroactively. The amelioration doctrine provides that "amendments to statutes that lessen their penalties are applied retroactively . . . ." *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000); see also *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 663, 16 A.3d 676 (2011) (under amelioration doctrine, "when [the] legislature has amended [a] statute to mitigate [the] penalty for [a] crime, [the] new law applies to cases in which [the] defendant committed [the] crime before [the] amendment, but was sentenced after [the] amendment"), citing *In re Estrada*, 63 Cal. 2d 740, 745–46, 408 P.2d 948, 48 Cal. Rptr. 172 (1965). As the United States Court of Appeals for the Tenth Circuit has explained, "where a criminal statute is amended, lessening the punishment, a defendant is entitled to the benefit of the new act, although the offense was committed prior thereto." *Moorehead* v. *Hunter*, 198 F.2d 52, 53 (10th Cir. 1952). "[T]he predominant state court view . . . favors retroactive application of ameliorative sentencing legislation despite a general savings statute." *Holiday* v. *United States*, 683 A.2d 61, 66 (D.C. 1996), cert. denied sub nom. *Palmer* v. *United States*, 520 U.S. 1162, 117 S. Ct. 1349, 137 L. Ed. 2d 506 (1997). Under this doctrine, "[t]he key date is the date of final judgment. If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies." (Internal quotation marks omitted.) *People* v. *Vieira*, 35 Cal. 4th 264, 305, 106 P.3d 990, 25 Cal. Rptr. 3d 337, cert. denied, 546 U.S. 984, 126 S. Ct. 562, 163 L. Ed. 2d 473 (2005), quoting *In re Estrada*, supra, 744. This rule applies "except when the [l]egislature, in enacting the amendment, has expressed a contrary intent . . . ." (Citation omitted; emphasis omitted.) *People* v. *Utsey*, 7 N.Y.3d 398, 402, 855 N.E.2d 791, 822 N.Y.S.2d 475 (2006). In *Utsey*, the New York Court of Appeals explained that "[t]he gen-

eral rationale for the amelioration doctrine is that by mitigating the punishment the [l]egislature is necessarily presumed—absent some evidence to the contrary—to have determined that the lesser penalty sufficiently serves the legitimate demands of the criminal law. Imposing the harsher penalty in such circumstances would serve no valid penological purpose . . . . However, when the [l]egislature manifests a specific intent that an ameliorative amendment not be retroactively applied to underlying acts committed before the amendment's effective date, then the usual presumption—that the [l]egislature must have intended that the harsher penalty should no longer be applied to anyone—will have been rebutted, and the legislative will that the amendment apply only prospectively must be given effect." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id. In view of the fact that the amendment was passed and became effective before both the dates of trial and sentencing, I would apply the amelioration doctrine in the present case. There is simply no language in the amendment to the statute indicating that the statute was only to have prospective application.

Both New York and California follow the amelioration doctrine. It is particularly appropriate for us to look to New York law for guidance because "drafters of the [Connecticut Penal Code] relied heavily upon . . . the [P]enal [C]ode of New York . . . ." (Internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 811, 750 A.2d 1037 (2000); see also *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990).

At the present time, sixteen states have approved the doctrine, either by statute or judicial decision; see, e.g., *State* v. *Stafford*, 129 P.3d 927, 932 (Alaska App. 2006); while three states and the federal courts have rejected the doctrine by judicial decision. See, e.g., *Moton* v. *State*, 242 Ga. App. 397, 399–400, 530 S.E.2d 31 (2000). In all of the decisions which have accepted the doctrine, the rationale for the decisions is based upon the same foundation. Namely, "[t]his application of statutes reducing punishment accords with the best modern theories concerning the functions of punishment in criminal law. According to these theories, the punishment or treatment of criminal offenders is directed toward one or more of three ends: (1) to discourage and act as a deterrent upon future criminal activity, (2) to confine the offender so that he may not harm society and (3) to correct and rehabilitate the offender. There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution. . . . A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment

can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts." (Citation omitted.) *People* v. *Oliver*, 1 N.Y.2d 152, 160, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956). In *Oliver*, the fourteen year old defendant was charged with homicide for killing his younger brother. Id., 154. At the time of the offense, persons older than seven and younger than sixteen could be prosecuted for murder or any other capital crime. Id., 155. Three years after the offense, the legislature amended New York's homicide statute so that a child under the age of fifteen may be subjected only to treatment as a "delinquent" and not to punishment as a "criminal." Id. Even though the legislature's amendment changed the substantive nature of the crime, namely the identity element and the punishment, the New York Court of Appeals held that the change was ameliorative and, thus, applied retroactively. In the court's view, "[t]he amendatory statute unquestionably [fell] within the category of legislation reducing penalties for criminal activity. Its object and effect were to relieve children of a certain age from punishment as criminals . . . ." Id., 161.

While P.A. 09-138 did not reduce the punishment for larceny in the second degree, or reclassify it as a lesser felony, it had exactly that effect with respect to the defendant's conduct. Specifically, P.A. 09-138 increased the value of the goods necessary to constitute larceny in the second degree, a class C felony, from $5000 to $10,000. Thus, the principle expressed in *Oliver* is equally applicable in the present situation. Our legislature decided to increase the value of the property taken before an individual may be punished for a class C felony—and there is no basis, other than a desire for vengeance, not to make the legislature's considered judgment retroactive.

Connecticut's two general savings clauses, General Statutes §§ 1-1 (t) and 54-194, in my view, contrary to the majority's position, do not bar retroactive application of P.A. 09-138. Section 1-1 (t) provides: "The repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed." Section 54-194 provides: "The repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect." First, most courts in other states have held that general savings statutes do "not indicate that the [l]egislature intended the statute prior

to amendment to provide the terms of punishment where an amendatory act mitigates the authorized terms of punishment but continues to proscribe the same conduct." *People* v. *Schultz*, 435 Mich. 517, 529, 460 N.W.2d 505 (1990); see also *State* v. *Reis*, 115 Haw. 79, 165 P.3d 980 (2007) (ameliorative amendments applied to defendants because "neither of the statutes at issue contained specific savings clauses" [emphasis omitted]).

In my view, these savings statutes do not apply because we are not dealing with the repeal of a statute, as required by the savings statutes, rather, we are dealing with an amendment to a statute. Further, while the value of the goods necessary to convict of the class C felony has changed, the statute continued to proscribe the same conduct. In *Simborski* v. *Wheeler*, 121 Conn. 195, 196, 183 A. 688 (1936), this court considered a case in which the plaintiff was found guilty of murder in the first degree on April 25, 1935, the crime having been committed on March 5, 1935. At the time, the prescribed manner of death for murder was by hanging. Id., 196–97. After the entry of the judgment directing execution, the legislature passed two acts, chapter 161 of the Public Acts of 1935 (first act) and chapter 266 of the Public Acts of 1935 (second act). Id., 197. The first act permitted the warden of the state prison to appoint a suitable person to perform executions and specifically repealed inconsistent provisions of certain existing statutes. Id., 197–98. The first act was signed by the governor on May 21, 1935, and took effect upon passage. Id., 197. The second act added new statutory language permitting executions to be carried out up to five days after the date designated by the judge for passing sentence and changing the method of execution from hanging to electrocution. Id., 197–98. We held that the case was governed by the savings statutes because "[t]he situation before us is clearly within the intent of these provisions. In effect they attach to every act repealing a statute within their purview a saving clause such as that suggested in *State* v. *Daley*, [29 Conn. 272 (1860)], under which the repealed statute still remains in full effect as regards any matter covered by it." *Simborski* v. *Wheeler*, supra, 199. This court further stated that: "[The first act] is fully within the terms of [the savings statutes] by reason of its express provision for the repeal of so much of [the existing statutes] as was inconsistent with it. [The second act] does not contain any express repeal of the [existing statutes], but it does substitute . . . complete new statutory provisions. This constitutes just as complete and effective a repeal of the provisions in the place of which the substitution is made as though they had been in terms repealed." Id., 200. Thus, the decision of this court in *Simborski* relied upon the fact that the new statute either expressly repealed the prior statute, or its terms so completely replaced the prior statute that it effectively repealed the prior statute, in

order to engage the provisions of the savings statutes. Thus, this court held that the manner of execution should be conducted in accordance with the original statute. Id., 201. I note further that, in *Simborski*, since the statutory amendments became effective after the conviction, the original basis for the application of the amelioration doctrine did not exist.

In the present case, the legislature did not expressly repeal the prior statute. Rather, it merely amended the monetary provisions that classified the degree of the crime. The elements of the crime, aside from the monetary value, are the same. It can hardly be said that this amendment represented a wholesale change of the statute such that either of the savings statutes would be implicated or the *Simborski* decision would apply. This distinction becomes important when we consider the purpose for enacting the savings statutes in the first place. Indeed, the cases cited by the majority relate to an application of the doctrine when, either the punishment for the crime has changed, or there has been a wholesale change in the statute. I have not been able to locate one case wherein we have applied the doctrine to a situation in which the legislature has changed the dollar amounts necessary to convict someone of a crime, but left the essential elements of the crime and the punishment the same. Thus, I respectfully disagree with the majority's position that "the [amelioration] doctrine is in direct contravention of Connecticut's savings statutes."

The history of §§ 1-1 (t) and 54-194 demonstrates that the legislature enacted these statutes to negate the effect of the common-law abatement doctrine; see *Simborski* v. *Wheeler*, supra, 121 Conn. 198–99; *State* v. *Daley*, supra, 29 Conn. 272; and not to prevent ameliorative amendments from having retroactive application. Therefore, I agree with the majority that "it is true that §§ 54-194 and 1-1 (t) were enacted in 1871 and 1881, respectively, to counter the effect of the common-law abatement doctrine." The common-law abatement doctrine allowed a defendant to escape prosecution entirely due to a statutory gap. Thus, the repeal of one statute, without the concomitant enactment of another statute allowed people who had committed crimes to go free. *Daley* serves as the perfect example of escape of prosecution due to a statutory gap. In *Daley*, the defendant had been convicted of manslaughter. *State* v. *Daley*, supra, 272. The crime was committed on May 6, 1860, and the defendant was tried and convicted in July, 1860. Id. Between the time the defendant committed the offense and his trial, the legislature passed an act expressly repealing the statute in force when the crime was committed, which had fixed the punishment for manslaughter as a fine not exceeding $1000 and imprisonment of not less than two years or more than ten years. Id. 273. That act provided in relevant part: " 'That [§] sixth, of the act of which this is an alteration, be

and the same is hereby repealed.' " Id. The new act, which had an effective date of July 4, 1860, was effective prior to the trial and conviction of the defendant. Id. It provided a penalty for manslaughter of a fine not exceeding $1000 and imprisonment not exceeding ten years. Id. This court held that the defendant could neither be legally convicted under the statute that had been repealed nor under the statute which was substituted for it, because that was by its own terms prospective in operation. This court reasoned that "[h]is escape from punishment might easily have been prevented if the legislature had, as they usually do, on the repeal of criminal laws, modified the repeal by a saving from its operation of offenses committed against the repealed law prior to such repeal." Id., 275.

Years later, this court again stated that "[n]o doubt it was to avoid just such an oversight by the [l]egislature as suggested in [*Daley*] that [c]hapter 107 of the Public Acts of 1871 was enacted . . . . [That statute] provides as follows: 'The repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect.' Ten years later, in 1881, the [l]egislature passed [another] act which provided that, in the construction of all statutes thereafter enacted, except where such construction would be repugnant to the express terms of the statute: 'The repeal of an act shall not affect any punishment, penalty, or forfeiture incurred before the repeal takes effect, or any suit or prosecution, or proceedings pending at the time of the repeal for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed.' [Public Acts 1881, c. 1]." *Simborski* v. *Wheeler*, supra, 121 Conn. 198–99. Thus, the savings statutes were passed to prevent the situation where a defendant is able to escape punishment for a crime because of a repeal. In my view, the savings statutes were not intended to apply to a situation wherein the legislature may have amended the definition of the degree of crime by changing the dollar amounts involved, but not changed the fact that a crime still existed for which there would be some form of punishment.

The present situation is different from *State* v. *Harris*, 198 Conn. 158, 166–68, 502 A.2d 880 (1985), wherein this court held that the savings statutes applied when the legislature had changed the qualification for a persistent felony offender by both exempting a prior conviction for a class D felony and changing eligibility criteria by changing the convictions required from one conviction with a prison term of more than one year to a requirement of two felony convictions in the absence of a class D felony conviction. In my view, this change represented a wholesale change of the statute that would fit the criteria established in *Simborski* v.

*Wheeler*, supra, 121 Conn. 198–99.

Further, the history of P.A. 09-138 supports retroactive application. The purpose of P.A. 09-138 was to adjust the property values in the larceny statute to account for twenty-seven years of inflation and to save the state money. Retroactive application furthers those goals. Neither P.A. 09-138, nor the plain language of General Statutes (Rev. to 2009) § 53a-123, as amended, states whether the amendments were retroactive or prospective. "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *418 Meadow St. Associates*, *LLC* v. *Clean Air Partners*, *LLC*, 304 Conn. 820, 829, 43 A.3d 607 (2012).

The joint favorable report of the Judiciary Committee on House Bill No. 6576, which would eventually become P.A. 09-138, noted that the bill "would adjust the monetary values utilized in the larceny statutes to more accurately reflect the actual values today. The values, last updated in 1982, are adjusted using the consumer price index." Report on Bills Favorably Reported by Committee, Judiciary, House Bill No. 6576 (March 16, 2009). The report also included a statement by the Office of the Chief Public Defender that "[a]pplication of [the consumer price index] to the existing amounts notes that these values have more than doubled since 1982." Id. The goal to make the larceny statute "more accurately reflect the actual values today"; id.; suggests a strong preference for retroactive application. The legislature's obvious intent was to eliminate a disparity created over time in terms of the degree of larceny with which the state charges defendants who stole property of the same monetary value. The disparity did not arise overnight, however, it affected many defendants prior to the effective date of P.A. 09-138—especially those, like the defendant himself, who committed larceny only a few months before that date. Further, the fiscal note attached to House Bill No. 6576 states that passage of the bill would have a "potential[ly]" significant savings for fiscal years 2010 and 2011. Office of Fiscal Analysis, Connecticut General Assembly, Fiscal Note, House Bill No. 6526, An Act Concerning Larceny. The note's analysis had found that "[t]o the extent that these changes decrease the maximum criminal penalties to which larceny offenders are exposed, a potential savings related to probation supervision and incarceration (in addition to a potential revenue loss from criminal fines) exists. On average, it costs the state [$3736] to supervise an offender on probation in the community as compared to $44,165 to incarcerate the offender." Id. The note also estimated that there are 4259 larceny convictions per year in Connecticut. Id. The inclusion of these fig-

ures in the fiscal note also suggests a preference for retroactive application because of the potential additional savings to the state's general fund. Certainly, saving money is a rational and consistent legislative purpose and adopting the amelioration doctrine in this case would further that legislative purpose. The history and policy goals of P.A. 09-138 thus coincide with a "legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." *People* v. *Oliver*, supra, 1 N.Y.2d 160.

The adoption of the doctrine, in the present case, would further the legislative goals of both recognizing the adjustment of monetary values utilized in the larceny statutes to more accurately reflect the actual values today, and saving the state money through the usage of probation instead of incarceration. Because I agree with part I of the majority opinion, I would affirm the conviction in this matter. I would, however, adopt the amelioration doctrine in this case, reverse the Appellate Court judgment with respect to sentencing, and remand the case to the trial court for resentencing. Therefore, I respectfully concur in part I of the majority opinion and dissent from part II of that opinion.

———————————