******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring in the judgment. In *State* v. *Kalil*, 314 Conn. 529, 107 A.3d 343 (2014), this court held that the principles animating the common-law amelioration doctrine were "in direct contravention" of the applicable Connecticut savings statutes governing the retroactive application of repealed statutes[1] and, therefore, did not permit a sentencing court to confer the benefits of ameliorative legislation on a defendant whose crime predated the ameliorative legislation's effective date, even when the sentencing itself took place after that date. Id., 553; see id., 553–59. Due regard for the policy of stare decisis compels me to concur in the result reached by the majority on the basis of the holding in *Kalil*. I do so reluctantly, however, because I am convinced that *Kalil* was wrongly decided, and I am not enthusiastic about reaffirming its holding.[2] Justice Eveleigh cogently marshals the arguments why *Kalil* was wrongly decided in his concurring and dissenting opinion in that case, with strong supplemental support provided by case law from other jurisdictions that have persuasively construed their own savings statutes—statutory schemes no different from ours in substance, and motivated by precisely the same policy concerns—to accommodate the amelioration doctrine.[3] See id., 559–70 (*Eveleigh, J.*, concurring and dissenting); see also E. Morrison, "Resurrecting the Amelioration Doctrine: A Call to Action for Courts and Legislatures," 95 B.U. L. Rev. 335, 339 (2015) (arguing that courts and legislatures should adopt amelioration doctrine and follow example set by high courts in New York, California, Minnesota and Michigan, in particular). No purpose is served by repeating or elaborating those arguments here.

If we were writing on a clean slate—that is, if *Kalil* had never been decided—the present case would provide a particularly strong occassion for adoption of the amelioration doctrine in that the legislation at issue was intended to implement precisely the kind of public policy that the amelioration doctrine is designed to promote. The idea underlying the amelioration doctrine is that "[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." *People* v. *Oliver*, 1 N.Y.2d 152, 160, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956). With respect to Public Acts, Spec. Sess., June, 2015, No. 15-2 (Spec. Sess. P.A. 15-2), the argument for application of the doctrine is especially compelling because the statutory amendment reflected the legislature's belief that the preexisting, stricter punishment regime supplanted by the ameliorative legislation was not merely *unnecessary* to meet the legitimate ends of the criminal law but was affirmatively *destructive*

of those ends. Indeed, as the following discussion illustrates, the fundamental public policy driving the passage of Spec. Sess. P.A. 15-2 was the legislature's determination that the preexisting sentencing regime governing the criminal offenses committed by the defendant, Haji Jhmalah Bischoff, caused ruinous penological results and, by the legislature's own determination, must be torn out by the roots and replaced with a fundamentally different and less punitive model animated by a radically contrasting conception of crime and punishment in the particular context of drug possession. I recount this legislative background to highlight the irony inhering in our decision today, which requires a trial court, in the name of deference to the legislative will, to impose sentence on the defendant under a statutory regime that the legislature itself considers discredited and outmoded, rather than under the new, more enlightened regime enacted by the legislature prior to the defendant's sentencing.[4]

Section 1 of Spec. Sess. P.A. 15-2 was passed as part of a large-scale criminal justice reform effort known as the Second Chance Society initiative, which aimed to reverse policies that had led to mass incarceration and sought to treat rather than to punish drug users.[5] Representative William Tong, who introduced the legislation in the House during the regular legislative session, explained that incarcerating individuals for mere drug possession had not "accomplished our goal of eradicating drug abuse and drug addiction." 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8100. Instead, "we have sent generations of young men, predominantly from our cities, to jail." Id. Representative Tong explained that the bill constituted a landmark shift in public policy that "fundamentally remakes our criminal justice system and our drug policy . . . ." Id., p. 8097. He also denounced the state's former strategy of mass incarceration of nonviolent drug possessors: "[W]e want to be smarter on crime, and we know that creating a generation of felons and a strategy of mass incarceration of people for simple possession just isn't working." 58 H.R. Proc., Pt. 25, June, 2015 Sess., pp. 8488–89. Representative Tong characterized the Public Act as "a second chance to get this right. We have a second chance to continue to be tough on crime but to be smarter on crime. Today we have a chance to take a major step in building a smart and smarter drug policy and to get this right." 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8102.

Senator Eric D. Coleman introduced the bipartisan bill to the Senate during the regular session, explaining that Spec. Sess. P.A. 15-2, § 1, "puts a greater emphasis on alternatives to incarceration and . . . treatment— perhaps hopefully a more rational treatment of nonviolent offenders." 58 S. Proc., Pt. 10, 2015 Sess., p. 3110. According to Senator Coleman, "the bill . . . encourages we as policymakers and we who are concerned about the administration of criminal justice in our state

to treat mere drug possession as something that requires medical treatment rather than criminal sanctions." 58 S. Proc., Pt. 12, June, 2015 Spec. Sess., p. 3542. The legislative history also makes clear that the bill was intended to help drug-dependent individuals reintegrate into society. Senator John A. Kissel noted: "What I think this bill is about is redemption and our belief that most folks in our society may make a mistake, may make two, may make more, but fundamentally we believe people can turn their lives around." Id., p. 3545. In response to a question from Representative Charles J. Ferraro regarding how the bill would reduce crime, Representative Tong explained: "I think the most accessible and most obvious [way] is that sentencing young people or any person, frankly, for simple possession for a mandatory minimum and a felony, has [the] potential and likelihood to ruin their life. . . . I think this is about recidivism, giving people a shot after they've made a mistake to get a job, [to] get on with their lives and to do good." 58 H.R. Proc., Pt. 24, 2015 Sess., p. 8160. Representative Richard A. Smith noted the change from a punitive to a rehabilitative model: "I agree 1000 percent that I would rather see someone who has a drug issue get treatment as opposed to [go] to jail. Jail does not serve that person. Jail does not serve society. It doesn't bring him or her back in and make that person a better person and a productive person." Id., p. 8137. Senator Martin M. Looney, the president pro tempore of the Senate, remarked on the change in policy, noting that "unfortunately in our society we have too many people serving life prison sentences on the installment plan; in, out, in, out, back again, never really establishing themselves in society. And the difficulty is that those who have their prospects in life blighted by an early criminal conviction often, for a very minor drug offense, wind up being haunted by that and having prospects foreclosed for the rest of their lives." 58 S. Proc., Pt. 10, 2015 Sess., p. 3126. Senator Catherine A. Osten, who explained that she had worked in the Department of Correction for twenty-one years, made similar remarks and also noted the fiscal impact of over incarceration in this state: "I think that this bill will finally take control of a population that does not deserve to be inside our correctional [system] and could actually be productive citizens, which is something that would be wonderful to see." Id., p. 3114. She added: "In addition to that, I think that this finally starts realizing the second event that will happen as a result of this, and that is fiscal control . . . over a burgeoning correctional budget." Id.

These same sentiments were echoed by Governor Dannel P. Malloy, who made clear when signing Spec. Sess. P.A. 15-2 into law that the state was implementing "systematic change" and making a dramatic shift in its approach to nonviolent drug possessors: "The cycle our system currently encourages—one of permanent

punishment—hurts too many families and communities. When we should have been focusing on permanent reform, we focused on permanent punishment. For too long, we built modern jails instead of modern schools. Because this bill passed, Connecticut has taken a giant step into the future." (Internal quotation marks omitted.) D. Malloy, Press Release, Gov. Malloy Signs "Second Chance Society" Bill To Further Reduce Crime and Successfully Re-Integrate Nonviolent Offenders into Society (July 9, 2015), available at https://portal.ct.gov/Malloy-Archive/Press-Room/Press-Releases/2015/07-2015/Gov-Malloy-Signs-Second-Chance-Society-Bill-to-Further-Reduce-Crime-and-Successfully-ReIntegrate-Non (last visited January 14, 2020). "[M]ost of all," Governor Malloy said, "these initiatives are focused on turning nonviolent offenders into productive members of our society [who] can contribute to our economy, rather than drain it." (Internal quotation marks omitted.) Id.

Although there is no legislative history directly addressing the retroactive application of Spec. Sess. P.A. 15-2, there is strong circumstantial evidence that the legislature intended the ameliorative provisions contained therein to apply to individuals, like the defendant, who had not yet been sentenced as of the amendment's effective date. In his remarks, Representative Tong specifically included inmates like the defendant whose cases were then pending among the individuals who should not be incarcerated and who are part of a generation whose lives have been "ruined" by the state's former policy: "By way of example, right now we have 500 [people] locked up in our state. . . . [T]he controlling offense, meaning the most serious offense is drug possession. Two hundred of them are there because of a sentence, *300 are in pretrial*. There are estimated [to be] about 1150 inmates, which includes parolees, for whom the controlling offense was drug possession. Over a generation, that's thousands of people. Thousands of people whose lives have been changed, and you might say ruined, because they made a mistake and because they were given a felony, and a mandatory minimum. They went away for two years or longer, and they've not been able to get their lives in the right direction since." (Emphasis added.) 58 H.R. Proc., Pt. 24, 2015 Sess., pp. 8100–8101. Likewise, there is evidence that the fiscal savings expected by the legislature and calculated by the Office of Fiscal Analysis were based on the retroactive application of Spec. Sess. P.A. 15-2 to persons whose cases were pending on the statute's effective date. See Office of Fiscal Analysis, Connecticut General Assembly, Fiscal Note, House Bill No. 7104, An Act Implementing Provisions of the State Budget for the Biennium Ending June 30, 2017 Concerning General Government Provisions Relating to Criminal Justice.

The foregoing legislative history vividly reveals the ironic dissonance inhering in this court's decision to

reject the amelioration doctrine. Most immediately, I find it ironic that we are required, in the name of deference to the will of the legislature, to defeat and frustrate the will of the legislature as it relates to the sentencing reform initiatives embodied in Spec. Sess. P.A. 15-2.[6] I agree with the majority that it is not necessarily "absurd" to believe that the legislature might have deemed the prior sentencing scheme ruinous and destructive but chose, at the same time, to apply its reform measures prospectively only. But such a legislative choice, even if not outright absurd, strikes me at the very least as exceedingly odd and counterintuitive and, therefore, unlikely; were it not for the precedential mandate of *Kalil*, I certainly would not presume from the legislature's silence in Spec. Sess. P.A. 15-2 regarding retroactive application that it intended for any future sentencing, occurring after the effective date of the amendment, to implement the very sentencing regime it had just denounced as inimical to good public policy.

The irony runs deeper still because, in my view, the legislative will that *Kalil* claimed to be upholding is based on a contested statutory construction *of our own making*. This point follows from my view, shared by scholarly commentators and a number of respected high courts, that general savings statutes do not compel the result reached in *Kalil*; instead, those statutes were intended to avoid the untoward and unintended consequences arising from strict application of the common-law abatement doctrine (as it interacts with the constitutional ex post facto doctrine) and were never actually intended by the legislature to preclude retroactive application of ameliorative amendments such as Spec. Sess. P.A. 15-2. See *State* v. *Kalil*, supra, 314 Conn. 563–64 (*Eveleigh*, *J.*, concurring and dissenting); see also E. Morrison, supra, 95 B.U. L. Rev. 341–42 ("General saving statutes were meant to address the limited problem of pardons resulting from the interplay between the doctrine of abatement and the constitutional prohibition against ex post facto laws. . . . General saving statutes were not intended to eliminate the amelioration doctrine, which merely offered a defendant the benefit of a reduction in penalty after a legislature amended the charging statute." (Footnotes omitted.)); footnote 3 of this opinion (citing cases). The expansion of the savings statutes to encompass ameliorative amendments within the scope of their presumption of prospective only application, in other words, is not the ineluctable and unavoidable outcome of legislative design and intention. Rather, it is the result of a series of decisions of this court imposing our gloss on the relevant statutes.[7] The irony arises from the fact that we purport to undertake and execute our role in the construction of the savings statutes, and Spec. Sess. P.A. 15-2, under what I take to be the self-concealing and ill-fitting cloak of judicial restraint, as if the contested meaning, scope and application of these statutes arise out of the unme-

diated exercise of legislative will embodied in the "plain" meaning of the laws under review. The reality is that this court has played an active and important role formulating the rule of statutory construction governing the present case. Our holding in the present case enforces the rule that we articulated in *Kalil*.

This final point returns me to the reason that I concur in the judgment. The operative rule of statutory construction—accurately stated by the majority as holding "that changes [including ameliorative changes] to the sentencing scheme of a criminal statute are not retroactive unless explicitly stated [in the amending legislation]"; part I of the majority opinion—was made crystal clear by this court in *Kalil*, a decision issued in 2014 and therefore available to the legislature when Spec. Sess. P.A. 15-2 was debated and adopted. Under these circumstances, my disagreement with *Kalil* is not a sufficient reason to vote to reverse that precedent or its construction of the relevant savings statutes. "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and . . . is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). The principles underlying the doctrine of stare decisis are at their zenith when we are asked to overturn "a decision that involves the construction of a statute." (Internal quotation marks omitted.) Id., 520.

The arguments for and against the adoption of the amelioration doctrine were analyzed and resolved in *Kalil*. The defendant has not raised any new arguments—he "has simply repeated the arguments that the parties made and that this court rejected in [*Kalil*], which does not justify a departure from principles of stare decisis." *Spiotti* v. *Wolcott*, 326 Conn. 190, 204, 163 A.3d 46 (2017). If the legislature wishes to reverse the presumption established in *Kalil* for ameliorative statutes, it may enact legislation to that effect, as has been done in at least nine states.[8] Accordingly, I reluctantly agree with the majority that we are bound by *Kalil* to hold that Spec. Sess. P.A. 15-2 does not apply retroactively to the defendant. I therefore concur in the judgment.

[1] See General Statutes § 1-1 (t) ("[t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed"); General Statutes § 54-194 ("[t]he repeal of any statute defining or prescribing the punishment for any crime shall

not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect").

[2] I disagree with the majority to the extent that its review of our earlier case law suggests that the outcome in *Kalil* was foreordained by "extensive case law" dating back to *Simborski* v. *Wheeler*, 121 Conn. 195, 183 A. 688 (1936). Part I of the majority opinion; id. (opining that prior case law "lays to rest any doubt" regarding applicability of savings statutes). I see no evidence that this court, prior to *Kalil*, ever considered or adjudicated the question of whether the amelioration doctrine could or should be adopted as part of our laws governing the retroactive application of criminal statutes. As of 2011, in fact, we expressly declined to rule on the question when it was directly raised by a petitioner, leaving the issue unresolved. See *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 663 n.14, 16 A.3d 676 (2011) ("[t]his court has not previously held that ameliorative changes to criminal statutes apply retroactively and we express no opinion on that question here"). The Appellate Court rejected the doctrine in *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000), but provided no analysis of the issue beyond declaring that adoption of the doctrine would improperly "intervene in the legislative process to nullify by judicial fiat the legislature's savings statutes."

[3] See, e.g., *In re Estrada*, 63 Cal. 2d 740, 745, 747–48, 408 P.2d 948, 48 Cal. Rptr. 172 (1965) (noting that general savings statute simply reflected legislature's "intent that an offender of a law that has been repealed or amended should be punished" but did "not directly or indirectly indicate whether [the offender] should be punished under the old law or the new one," and holding that "the [l]egislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply"); *People* v. *Schultz*, 435 Mich. 517, 529, 460 N.W.2d 505 (1990) (general savings statute was intended "to prevent technical abatements from barring actions to enforce criminal liability and thereby excusing offenders from punishment" but was not intended "to save the terms of punishment in effect on the date of offense when an ameliorative amendment was subsequently enacted and the case had not yet reached final disposition before [the state's Supreme] Court"); *People* v. *Oliver*, 1 N.Y.2d 152, 159–60, 134 N.E.2d 197, 151 N.Y.S.2d 367 (1956) (general savings statute, which was intended "to preserve the [s]tate's right to prosecute offenses previously committed under the repealed statute," did not preclude application of "an ameliorative statute [that] takes the form of a reduction of punishment for a particular crime").

[4] The majority states that, because "the plain language of Spec. Sess. P.A. 15-2, § 1, clearly and unambiguously prohibits retroactive application," we have no need even to examine this legislative history. Part I of the majority opinion. As the majority acknowledges elsewhere in its opinion, Spec. Sess. P.A. 15-2 is silent on the question of retroactivity, and the meaning of that silence only becomes "unambiguous" in light of the presumption of a prospective only intent arising from our holding in *Kalil*. I agree that our holding in *Kalil* is clear and unambiguous. I further agree that, in light of *Kalil*, we must interpret Spec. Sess. P.A. 15-2 to apply only prospectively under the operative savings statutes as construed in *Kalil*. My point is that the legislative history of Spec. Sess. P.A. 15-2, which the majority feels compelled to ignore under *Kalil*, should cause us to doubt the wisdom of the holding in *Kalil*.

[5] Senate Bill No. 952, as amended by Senate Amendment A, was introduced during the regular legislative session. See Substitute Senate Bill No. 952, Senate Amendment, Schedule A, LCO No. 9318, 2015 Sess. It passed the Senate but then was passed only temporarily by the House. The same legislation was taken up during the June Special Session, where it passed both chambers in the form of Spec. Sess. P.A. 15-2, § 1. The legislative background I discuss refers to statements made during both the regular and the special sessions.

[6] To be clear, I am not suggesting that our holding today directly contravenes a deliberate, conscious, and articulated legislative intention to apply Spec. Sess. P.A. 15-2 retroactively. Although it seems clear from the legislative record that one of the main sponsors of the legislation, Representative Tong, almost certainly intended retroactive application to unsentenced violators, there is no evidence that the legislature as a whole gave the precise question any thought. I agree with the majority that, as a result of this legislative silence, our rules of construction since *Kalil* require us to *presume* an intention of a prospective only application. My point is that the presump-

tions we make regarding a prospective only legislative intention have caused the Judicial Branch in this case to impose and uphold a sentence that fundamentally conflicts with the explicit policies, purposes and principles animating the sentencing legislation that had been enacted at the time of the defendant's sentencing. Because that result is deeply counterintuitive, I would prefer, if writing on a clean (pre-*Kalil*) slate, to apply a rule of construction that employs the opposite presumption, namely, that the legislature intends ameliorative criminal statutes to apply retroactively.

[7] The majority declines to accept responsibility for this court's active role in producing the operative rule—the rule that ameliorative changes to the sentencing scheme of a criminal statute are not retroactive unless explicitly stated in the amending legislation—by pointing to the mandatory regime of statutory construction imposed by General Statutes § 1-2z, the so-called plain meaning statute. Again, I agree that *Kalil* settled that question when it held that the text of the savings statutes creates a plain and unambiguous rule. See *State* v. *Kalil*, supra, 314 Conn. 553 (declining to adopt the amelioration doctrine "because the doctrine is in direct contravention of Connecticut's savings statutes"). I do not agree, however, that *Kalil* settled the question correctly. At a purely textual level, the controversial question is what the savings statutes mean by the word "repeal." Did those statutes, when enacted, intend to include within their scope statutory amendments that happen to be effectuated as a technical matter by the mechanism of a repeal? See id., 563–64 (*Eveleigh, J.*, concurring and dissenting) ("[i]n my view, these savings statutes do not apply because we are not dealing with the repeal of a statute, as required by the savings statutes, rather, we are dealing with an amendment to a statute"). The answer may be yes or it may be no, but the text standing alone does not resolve the question. In other words, although the savings statutes are perfectly clear that repealing statutes will not be construed to be retroactive unless they provide for retroactive application in express terms, the *scope* of those savings statutes—that is, whether they apply to ameliorative amendments such as Spec. Sess. P.A. 15-2—is not at all obvious without major interpretive work supplied by the judiciary. Indeed, this is the whole point of the cases and commentators opining that such savings statutes were never meant to preclude adoption of the amelioration doctrine. See, e.g., E. Morrison, supra, 95 B.U. L. Rev. 341 (explaining historical origin of savings statutes and reason why those statutes do not preclude adoption of amelioration doctrine). The point is particularly salient in Connecticut because we know for a fact that the legislature enacted our savings statutes in the late nineteenth century specifically "to counter the effect of the common-law abatement doctrine" in direct response to this court's decision in *State* v. *Daley*, 29 Conn. 272 (1860); *State* v. *Kalil*, supra, 556; and not with any apparent intention to preclude adoption of the amelioration doctrine. See id., 565–66 (*Eveleigh, J.*, concurring and dissenting). I refuse to believe that fidelity to the statutory text requires us to blind ourselves to the particular historical context producing that text.

[8] See 5 Ill. Comp. Stat. 70/4 (West 2013) ("[i]f any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect"); Ky. Rev. Stat. Ann. § 446.110 (LexisNexis 2010) ("[i]f any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect"); N.H. Rev. Stat. Ann. § 624:5 (2001) ("[n]o offense committed and no penalty or forfeiture incurred, under any of the acts repealed by house bill no. 75 of the 1955 session of the general court, and before the time when such repeal shall take effect, shall be affected by the repeal, except that when any punishment, penalty, or forfeiture shall be mitigated by the provisions of the Revised Statutes Annotated, such provisions may be extended and applied to any judgment to be pronounced after such repeal"); Ohio Rev. Code Ann. § 1.58 (B) (West 2004) ("[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended"); Tex. Government Code Ann. § 311.031 (b) (West 2013) ("[i]f the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended"); Vt. Stat. Ann. tit. 1, § 214 (c) (2015) ("[i]f the penalty or punishment for any offense is reduced by the amendment of an act or statutory provision, the

same shall be imposed in accordance with the act or provision as amended unless imposed prior to the date of the amendment"); Va. Code Ann. § 1-239 (2017) ("if any penalty, forfeiture, or punishment be mitigated by any provision of the new act of the General Assembly, such provision may, with the consent of the party affected, be applied to any judgment pronounced after the new act of the General Assembly takes effect"); W. Va. Code Ann. § 2-2-8 (LexisNexis 2018) ("if any penalty or punishment be mitigated by the new law, such new law may, with the consent of the party affected thereby, be applied to any judgment pronounced after it has taken effect").

———————————————————